A. D. HENLEY

*v.*

STATE COMPENSATION COMMISSIONER *et al.*

(No. 9812)

Submitted April 9, 1946. Decided May 14, 1946.

*Patrick J. Flanagan,* for appellant.

*Crockett & Tutwiler,* for appellee.

RILEY, JUDGE:

On December 14, 1944, claimant, A. D. Henley, filed with the State Compensation Commissioner his claim for benefits for silicosis alleged to have been contracted

while he was employed by Carter Coal Company. He prosecutes this appeal from an order of the Workmen's Compensation Appeal Board, entered December 8, 1945, affirming an order of the State Compensation Commissioner dated September 1, 1945, refusing claimant compensation for alleged silicosis upon the ground that claimant's "exposure within one year prior to the filing of his application was insufficient to have produced silicosis, or to have injuriously aggravated a pre-existing silicosis."

A hearing was had before the Silicosis Medical Board, which found that claimant has silicosis in the first stage; that he had had sufficient exposure to silicon dioxide dust in the State of West Virginia in the same employment to have produced this disease; and that his exposure within one year prior to the filing of his application on December 14, 1944, was "insufficient to have produced this disease, or injuriously aggravate a pre-existing silicosis. This opinion is based upon a complete and comparative study of x-ray films made June 15, 1944 and May 14, 1945."

Claimant had been employed in the same mine from 1929 until he quit work in February, 1945, and retired to a farm. The present employer took over the operation of the mine in 1932. From 1929 to 1934 claimant was employed as a section boss, and from 1934 until he ceased work, he worked as fire boss. During the first-mentioned period he spent about fifteen per cent of his time in laying tracks and shooting coal, and about ten per cent in acting as fire boss. His work as fire boss consisted of two inspections every twenty-four hours for the purpose of determining whether any hazards existed in the mine. It was his custom and required duty to walk along the haulage ways in going to and from the area under his supervision. He testified, without substantial contradiction and he is corroborated by other witnesses, that in his employment as fire boss he encountered dust in substanial quantities, both in the places he was required to

inspect and in the haulage ways. Three kinds of dust were present: coal dust, rock dust, and dust created by sand placed on the rails in order to give traction to the motors.

The record discloses that rock dust in considerable quantities was present in the mine, it being required that it be placed in the mine in the ratio of sixty per cent to forty per cent of coal dust in order to allay the latter dust; but the analyses of six samples of this dust, made in 1939, disclosed a very small quantity of silica present. No analysis was shown of any sample of rock dust taken from the mine during the one-year period immediately preceding the filing of this claim. Claimant and his witnesses, however, testified that a fine dust was created by the sand, from the sandboxes on the motors, being ground up on the rails by the motors; that in order that the passages in the sandboxes should not become clogged, it was customary for employer to have the sand dried by artificial means; that a considerable amount of dust so created was "kicked up" by the men going in and out of the mine; and that the motors, as they ran along the haulage ways and passed claimant and other fire bosses, caused the dust, which was so fine that it could be seen only in the rays of their lights, to rise and float in the air. Claimant further testified that employer's mine was well ventilated, and had a strong air current moving through the haulage ways "which helps to bring the dust up and move it around and spread it out." "In going in the mines", he testified, "we usually would meet two or three motors, but that would not be every trip because we might go in without meeting any motors, and at other times motors might pass us two or three times."

On December 11, 1944, Dr. H. A. Bracey, claimant's personal physician, examined him and reported that claimant complained of shortness of breath on slight exertion; that his capacity for work had been impaired by silicosis; and that claimant is "able to do light work requiring only slight exertion." Prior to this examination claimant had been examined in June and July, 1944, at

Stevens Clinic Hospital, in which X-ray was used, and a diagnosis of silicosis was made. On May 7, 1945, Dr. W. Paul Elkin, employer's physician, from an X-ray examination reported: "The findings are consistent with silicosis, apparently secondary stage." On the same day Dr. J. Bankhead Banks, also employer's physician, examined X-ray films prepared by Dr. E. W. Squire, and made a personal examination of claimant, and both physicians reported: "Silicosis, with decreased physicial reserve for manual labor." This report contained the notations that in June and July, 1944, X-ray examinations were made at Stevens Clinic Hospital in Welch, and a diagnosis of silicosis was made. The report further stated: "Both the pulse rate and heart rhythm are rapid, even while resting, and this is increased by exercise tolerance tests which also show slight shortness of breath." The medical board's report of May 8, 1945, showed that claimant complained that, "About 2 years ago he noticed unusual shortness of breath on exertion. This became progressively worse, forcing him to quit work in Feb. 1945. Since then he has lived on a farm." Claimant testified that, "My breathing bothers me more than anything else"; that, "It is very hard for me to make a shift"; that he tires more easily than he did previously, a condition which he noticed for the first time about two years ago.

Claimant contends that the findings of the commissioner and appeal board are erroneous in that they are based upon an improper postulate contained in the Silicosis Medical Board's report that there was insufficient exposure within one year prior to December 14, 1944, the date of the filing of the instant claim, to have produced silicosis or to have injuriously aggravated a preexisting silicosis. It is asserted, and correctly so, that this finding of the medical board was based only upon a study of the X-ray films made on June 15, 1944, and May 14, 1945. Dr. Grisinger of the medical board testified on cross-examination by claimant's attorney that the board did not compare any X-rays made in December, 1943, at the be-

ginning of the one-year period prior to the filing of the claim, or any X-ray films during the five-months period, after the filing of the claim, with the X-ray films of June 15, 1944, and May 14, 1945. In view of the non-medical evidence that claimant was short of breath and experienced spells of weakness, and had difficulty in completing work on a shift, a condition which he noticed about two years prior to the hearing before the commissioner, and the medical evidence, other than the report of the medical board and the cross-examination of the members thereof, we do not think that the X-ray examinations, upon which the medical board relies, one about six months after the beginning of the one-year period prior to filing of the claim, and the other about five months after the filing of the claim, are sufficient to support a finding that claimant was not injuriously exposed to silicon dioxide dust in harmful quantities within the one-year period. The fact is, as disclosed by this record, that claimant, from the time he became a fire boss in December, 1934, until he quit work in February, 1945, for at least two protracted periods every twenty-four hours of a six- and sometimes a seven-day week, was exposed to sand dust of a fine quality, from which this record does not exclude the presence of silica, which, according to common knowledge, is frequently present in sand. Moreover, admittedly claimant has silicosis, which he had contracted in his employment, and the evidence to the effect that the same conditions existed in the mine from the time he was first employed in 1929 until he ceased work in February, 1945, and that from 1934 until 1945 he was engaged in the same kind of work, is unrebutted and well established in this record. In *Jones v. State Compensation Commissioner*, 128 W. Va. 737, 740, 38 S. E. 2d 376, this Court in affirming an award of compensation for silicosis in the second stage, said: "In the absence of any showing of a change in conditions in the mine, we think it reasonable to assume that his injuries exposure to silicon dioxide dust in harmful quantities continued to the date he ceased work." There is nothing in this record to indicate a standard of what should constitute injurious harmful exposure to s'li-

con dioxide dust in harmful quantities. Employees may differ in the extent to which exposure will harm them, depending upon the kind of work they do and the care which they take of themselves in the performance of their duties. The question is a factual one, which, under the case of *Fraga v. State Compensation Commissioner*, 125 W. Va. 107, 23 S. E. 2d 641, was for the medical board to determine in the first instance. Nevertheless, both the commissioner and the appeal board are fact-finding bodies. *Burgess v. State Compensation Commissioner*, 121 W. Va. 571, 5 S. E. 2d 804; *Epperson v. State Compensation Commissioner*, 113 W. Va. 559, 169 S. E. 168. Under the rule that evidence should be construed liberally in favor of claimant in compensation cases (*Lively v. State Compensation Commissioner*, 113 W. Va. 242, 167 S. E. 583), we are of opinion that the commissioner and appeal board erred.

It is further contended that under the reports of Doctors Bracey, Banks, and Squire, and claimant's testimony as to impairment in his capacity to work, claimant had silicosis in the second stage. These physicians gave claimant thorough examinations, and their reports would justify a finding of silicosis in the second stage. These reports, based upon both physical and X-ray examinations, are to the effect that claimant had silicosis, with decreased physical reserve for manual labor. True, the Silicosis Medical Board thought otherwise, but that board, though composed of experts, is a fact-finding board, and its findings are subject to review by the commissioner and appeal board. Neither the order of the commissioner nor the appeal board contains a determination of the question whether claimant had silicosis in the first or second stage. "On an 'appeal' from the Workmen's Compensation Appeal Board this Court will not determine a question in the first instance which has not been fully developed or which has not been considered by the Commissioner and the Appeal Board." *Billings v. State Compensation Commissioner, et al.*, 123 W. Va. 498, 16 S. E. 2d 804. We think upon remand of this case

that the commissioner and the appeal board should determine what stage of silicosis claimant has.

For the foregoing reasons the orders of the commissioner and appeal board are reversed and the case remanded.

*Reversed and remanded.*

KENNA, PRESIDENT, dissenting:

To my mind the majority opinion is a clear case of reasoning from effect to cause and, with the utmost deference, the conclusion therein reached is based almost entirely upon the statement therein made that the claimant was exposed to sand dust in quantities "from which this record does not exclude the presence of silica * * *". Of course, no burden rests upon employer to "exclude the presence of silica * * *". To the contrary, the claimant must show, among other things, that he was "exposed to silicon dioxide dust in harmful quantities". This I think he has failed to do. Admittedly the claimant has silicosis and admittedly he has worked for his present employer for fifteen years. It does not necessarily follow that his employment caused him to be exposed to silicon dioxide dust in harmful quantities nor that his condition occurred "in the course of, and resulting from his employment". True, silicosis is an occupational disease and hence our act makes it compensable without the showing of a definite event causing injury that would otherwise be necessary. That proposition does not, however, do away with the necessity that the disease result from the employment: not from the individual claimant's susceptibility. To my mind it is perfectly clear that there is where the majority opinion bases compensability in silicosis cases and by doing so makes the uniform operation of the act impossible. The most lavish expenditures and the highest degree of care would not fully protect the employer from indirect liability under the act if he employed a person highly sensitive to silicon dioxide poisoning, as this claimant appears to be. The employer is surely entitled to know

before injury, not afterward, what he must do to provide safe working places. There is no direct proof in the record before us that this claimant was ever actually exposed to more than one per cent of silicon, and that was in rock dust used as a protective measure for settling coal dust. The proof does show that he was exposed to other dust, coal and sand, for hours daily, but if they contained silicon dioxide, it is not shown. A showing of exposure to silicon dioxide in harmful quantities is absolutely lacking, unless the fact that claimant has silicosis proves that fact as well.

The act does not provide compensation for all persons who contract silicosis while employed at the specified localities and times. Its benefits are restricted to those exposed to silicon dioxide in *harmful quantities*, making it plain that within the meaning of the act there are harmful exposures and exposures not harmful. That fact should not be ignored. It is the basis upon which a workable criterion must be erected. What is a harmful exposure and what is an exposure not harmful? To say that contracting silicosis proves that the exposure was harmful makes the individual the test, and does away with the differences in exposure plainly recognized by the act. A person unusually sensitive to silicon dioxide can contract the disease from an exposure not harmful to others. But what amount of silicon dioxide in the atmosphere is dangerous to the average person continually exposed during working hours? That, to my mind, is the measure of what harmful exposure means. In my judgment, in order to be susceptible of uniform operation, our silicosis act must rest upon that foundation. Otherwise its validity may be questionable.

The fact that the employer elected to pay premiums into the silicosis fund, that Henley has silicosis, and that the circumstances are pathetically tragic are matters that should not be allowed to affect the question under consideration.

Since the Court's opinion does not recognize what I regard as essential proof, I dissent.