JOHN PAYNE

*v.*

STATE COMPENSATION DIRECTOR, AND PITTSBURGH PLATE GLASS COMPANY

(No. 12405)

Submitted February 2, 1965.     Decided March 16, 1965.

*Steptoe & Johnson, Willis O. Shay,* for appellant.

*Sprouse, Dickinson & Louderback, L. Eugene Dickinson,* for appellee.

BROWNING, PRESIDENT:

Upon application of the employer, Pittsburgh Plate Glass Company, this Court granted an appeal from an order of the workmen's compensation appeal board reversing an order of the state compensation director denying silicosis benefits to the claimant, John Payne, and remanding the claim to the director for a determination of claimant's disability.

Claimant filed an application for silicosis benefits on December 17, 1962, alleging his exposure to silicon dioxide dust in harmful quantities in this state and listing his employment with McNicol Pottery Company from April 12, 1919, to November 25, 1943, and with Pittsburgh Plate Glass Company from December 7, 1943, to November 10, 1962, the day he ceased work. The physician's report filed with his application diagnosed his condition as "siliocotuberculosis, reactivated".

The director, on February 8, 1963, made his preliminary nonmedical findings that claimant was exposed to the hazard of silicon dioxide dust for a continuous period of not less than 60 days while in the employ of Pittsburgh Glass, within two years prior to the filing of his claim, and that he had been so exposed in West Virginia over a continuous period of not less than two years during the ten years immediately preceding the date of his last exposure thereto, which findings were protested by the employer and the claim was set for hearing.

Claimant testified, in brief, that his principal employment with Pittsburgh Glass had been as a balcony man on the second balcony of what is described as a three-story drawing operation; the glass components, including silica sand, are mixed, passed into a tank where the mixture is melted and from which it is later drawn off by machine; as the glass is drawn, it frequently breaks into various size particles

which are carried through the air falling onto the balconies and floor; and, it was claimant's job to sweep this residue into a chute. Claimant also testified that he had become ill in 1955, and was sent to Hopemont Sanitarium for treatment of tuberculosis. Upon leaving Hopemont he entered Cleveland Clinic where a portion of his right lung was removed on January 21, 1957, returning to work in September, 1957. Claimant is corroborated as to the presence of glass particles or "dust" in his working area and three samples were collected from the floor of the second balcony which were sent to the Bureau of Industrial Hygiene for analysis. Sample No. 1 contained 45.9 per cent free silica, Sample No. 2, 38.4 per cent and Sample No. 3, 1.6 per cent. On cross-examination, the acting director of the bureau testified that only the percentages of free silica were determined, the size not being studied and that it would be impossible to determine from the samples how many particles were small enough to permit inhalation. This witness further testified that the results of the bureau analysis have little probative value insofar as the hazard of silicosis is concerned.

An engineer employed by Pittsburgh Glass to make a study of conditions collected both floor and free air samples at various times in the area in which claimant worked and concluded therefrom that there was no hazardous exposure to silicosis. His analysis of the free air samples determined them to contain less than five per cent free silica. This witness further testified that only free silica causes silicosis and a concentration of 50 per cent or more with a maximum exposure of eight hours a day does not cause silicosis in less than 18 years; the count should be less than 5 per cent or five million particles per cubic foot; less than 5 per cent is a permissible limit; and, there must be a sufficient quantity in the air to be harmful.

At the conclusion of the hearings, the director affirmed his previous findings as to harmful exposure within the statutory time limits and referred the claim to the silicosis medical board for its review. The silicosis medical board, on March 10, 1964, made its report to the director wherein it found that claimant is suffering from the disease of sili-

cosis complicated by a tuberculous infection but that the silicosis present in 1955 had not been perceptibly aggravated by harmful exposure during the statutory period of time. The report concluded: "A film made on May 23, 1955 at St. Mary's Hospital in Clarksburg was compared with the present study and on the left side, where there has been no previous surgery, there is now a definite improvement as compared to the study in 1955." No objection was made to these findings and on April 20, 1964, the director entered an order denying benefits to the claimant on the ground that his exposure to the hazard of silicon dioxide while in the employ of Pittsburgh Glass was not sufficient to perceptibly aggravate an existing silicosis.

As heretofore stated, this order was reversed by the workmen's compensation appeal board and, upon application of the employer, this Court granted an appeal on December 11, 1964.

Code, 23-4-1, as amended, provides, inter alia, for the disbursement of benefits to covered employees who "have been exposed to the hazard of silicon dioxide dust . . . and have contracted silicosis . . . or have suffered a perceptible aggravation of an existing silicosis, in this State in the course of and resulting from their employment. . . : Provided, however, that compensation shall not be payable for the disease of silicosis . . . unless in the State of West Virginia the employee has been exposed to the hazard of silicon dioxide dust over a continuous period of not less than two years during the ten years immediately preceding the date of his last exposure to such hazards. . . ." The section further states that the words "exposure to the hazard of silicon dioxide dust" and any similar language shall be construed to mean ". . . the exposure of an employee in the course of his employment to a working condition in which the air contains such a concentration of silicon dioxide dust that the breathing of such air by a person over a long period of time would be likely to cause him to contract the disease of silicosis."

Counsel for the claimant in brief and argument contends that the principal issue presented in this case is controlled

by the decision of this Court in *Henley* v. *State Compensation Commissioner, et al.,* 129 W. Va. 15, 38 S. E. 2d 380. We find that there is a factual distinction between the cases. In the *Henley* case the claimant had worked in a coal mine of the employer continuously between 1929 and February, 1945, and there was no evidence in the record that he had been employed prior to 1929 anywhere. X-ray films were made of the claimant's chest in December, 1943, June 15, 1944, and May 14, 1945, and upon a finding of the silicosis medical board that there was insufficient exposure to silicon dioxide within the one year period immediately preceding the filing of the claim, the director denied compensation on that ground, which ruling was affrmed by the appeal board. In reversing those rulings this Court stated that the lay evidence of the use of sand on the motor rails inside the mine and the crushing of it by the wheels of the motors and by the use of sand in dusting the mine to prevent explosions was sufficient to justify the conclusion that the claimant had been subjected to silicon dioxide dust in harmful quantities from the time of his employment until he ceased work in 1945. The Court said that claimant "was exposed to sand dust of a fine quality, from which this record does not exclude the presence of silica, which, according to common knowledge, is frequently present in sand." Judge Kenna took sharp issue with that statement in his dissenting opinion.

In the instant case the record shows that claimant had two employers, as heretofore stated, the McNicol Pottery Company, for which he worked from April 12, 1919, to November 25, 1943, and the employer in this case, for whom he worked from December 7, 1943, to November 10, 1962. No X-ray films were made of the claimant's chest at the time he ceased work with the pottery company nor until he had worked for this employer for approximately 12 years. If we were permitted to speculate as to where the claimant received the exposure to silicon dioxide dust which resulted in the serious disease of silicosis complicated by tubercular infection, we might find that "according to common knowledge" the exposure to silicon dioxide dust is much more pronounced in a pottery than in a plate glass factory. How-

ever, there is no occasion for speculation in this case as to the claimant's exposure to silicon dioxide dust in harmful quantities during the period of his employment with this employer inasmuch as the evidence of the witnesses for the claimant and the witnesses for the employer affirmatively shows the absence of silicon dioxide dust in harmful quantities at the time their examinations were made.

Mr. Roberts, Acting Director of the Bureau of Industrial Hygiene, produced as a witness for claimant, testified in part as follows:

"Q—Now rafter samples, as you have mentioned, what studies are conducted of them?

"A—That is chemical analysis to determine the percentage of materials present.

"Q—Is that all you do, just determine the percentage of silicon dioxide present, or do you do something more about the characteristic of silicon dioxide?

"A—In these particular samples we determine only the chemical percentages of free silica.

"Q—You did not then study the size of the particles of the silicon dioxide present in the samples?

"A—No, we didn't.

"Q—Is that important in determining the exposure to the hazard of silicon dioxide?

"A—In airborne samples it is very important, because only certain size dust particles can be breathed.

"Q—Big size, or small size?

"A—Of course, they have to be small size.

"Q—Do you know from these samples how many of these particles were present in the samples, that is the size particles that can cause silicosis?

"A—No, it would be impossible to tell from a settled sample like this.

"Q—That is not a reliable method of determining, is it?

"A—Not in determining particle size.

"Q—And particle size is a critical question in determining silicosis causes, isn't it?

"A—It is one of the important aspects, yes.

.   .   .

"Q—What is the most—I believe you call it—permissible threshold limits of concentration of free silica in the air? What is the permissible amount before you can begin to worry about silicosis?

"A—The threshold value that has been established in most recent standards in this range is 38 million particles per cubic foot of air.

"Q—Still you don't know on the basis of these samples whether the air in that vicinity contained that concentration of particles?

"A—Not on the basis of a grab sample. It would be impossible to tell.

"Q—Subject to later authentication by a witness whom I have present, I would like for you to look at what will be identified—I will ask that it be identified as Exhibit Venable Field Investigation Report.

.   .   .

"Q—And ask you from what you see on this Field Investigation Report whether you consider any of those samples as constituting hazardous exposure to silicon dioxide dust?

"A—These are at various locations. Would you like to give me one specific location?

"Q—Apparently the critical area is balcony No. 4, the second floor or tank No. 4.

"A—This would be which location, the first one?

"Q—The second floor of No. 4 drawing machine, say, and wherever else you find the same description.

"A—The counts here on samples 1 through 8 range from .08 millions particles per cubic foot up to one is the largest I see. This would all be within the recommended limits of threshold value.

"Q—All within?

"A—Yes, as I said, 38 million particles.

"Q—What is the highest?

"A—The highest I see on here is 1.0.

"Q—1/38th of the permissible limits?

"A—Yes.

"Q—Do you see any others on that report which would indicate hazardous exposure at any other place where any of the samples were taken, air samples?

"A—May I briefly run back over the silica percentages?

"Q—Yes.

"A—On 45.9 free silica the TVL would be 4.9 million particles per cubic foot.

"Q—By TVL, you better explain that.

"A—Threshold limit value. This is the lowest concentration that would be allowed. There are none of the counts here that are that high, of these counts.

"Q—So that all of the counts on that report indicate well within the permissible limits of hazard to silicon dioxide?

"A—Based on the percentages that we found, yes.

. . .

"Q—Were you asked by the claimant here, or his attorney or anyone else in his behalf, to conduct air sampling at the Pittsburgh Plate Glass Company plant in Clarksburg?

"A—No.

. . .

"Q—One final question, in the final analysis, the analysis that you had conducted on the samples which you were presented don't really prove anything so far as silicosis hazard is concerned, do they?

"A—Actually, the only thing the samples prove is we did find free silica in the samples. As to your question, I think I would have to say no.

There was, also, evidence to the effect that conditions had remained unchanged from the time that claimant was

first employed until these tests were made. This evidence confirms the unanimous finding of the silicosis medical board that the condition of the claimant's lungs had not been perceptibly aggravated by exposure to silicon dioxide dust between the years 1955 and 1964, this conclusion having been reached by a comparison of X-ray films of the claimant's chest made in those two years. See *Turner* v. *Comp. Comm'r.*, 147 W. Va. 1, 123 S. E. 2d 880; *Turner* v. *Comp. Comm'r.*, 147 W. Va. 145, 126 S. E. 2d 379; *Garges* v. *Comp. Comm'r.*, 147 W. Va. 11, 123 S. E. 2d 886; *Garges* v. *Comp. Comm'r.*, 147 W. Va. 188, 126 S. E. 2d 193.

We find that the ruling of the workmen's compensation appeal board wherein it reversed the order of the director denying silicosis benefits to the claimant was clearly wrong and it will be reversed. The order of the workmen's compensation appeal board of the 6th day of November, 1964, is reversed and the decision of this Court herein will be certified to the board and to the director.

*Reversed.*