256 S.E.2d 864 (1979)
Eufa M. HUDSON
v.
STATE WORKMEN'S COMPENSATION COMMISSIONER and Union Carbide Corporation.
No. 14243.
Supreme Court of Appeals of West Virginia.
January 23, 1979.
McIntyre, Haviland & Jordan, James B. McIntyre, Charleston, for appellant.
Benjamin D. Tissue, Legal Division, Union Carbide, South Charleston, for appellee.
PER CURIAM:
In this appeal the claimant, Eufa M. Hudson, widow of Clinton D. Hudson, seeks reversal of an order entered by the Workmen's Compensation Appeal Board on March 29, 1978. The Appeal Board's order set aside an award of widow's benefits to Mrs. Hudson on the ground that she had failed to establish a causal connection between her husband's death and his exposure to noxious fumes while in the employ of Union Carbide Corporation.
Mrs. Hudson filed her claim for widow's benefits under the provisions of W.Va.Code, 23-4-10. That code section, as in effect at the time of the filing of the claim and as applicable in this case, provided in part:
"[I]f death results [to an employee] from occupational pneumoconiosis or from any other occupational disease within ten years from the date of the last exposure to the hazards of occupational pneumoconiosis or to the other particular occupational hazard involved, as the case may be, the benefits shall be in the amounts and to the persons as follows:. . ."
Clearly this statute requires that an employee's death result from occupational pneumoconiosis or occupational disease as those terms are defined for the purposes of Chapter 23 of the W.Va.Code.
*865 W.Va.Code, 23-4-1, the section which defines occupational pneumoconiosis and other occupational diseases, provides in part:
"For the purposes of this chapter, occupational disease means a disease incurred in the course of and resulting from employment. . . Except in the case of occupational pneumoconiosis a disease shall be deemed to have been incurred in the course of or to have resulted from the employment only if it is apparent to the rational mind, upon consideration of all the circumstances (1) that there is a direct causal connection between the conditions under which work is performed and the occupational disease, (2) . . ."
This Code section, by its terms, defines "occupational disease" for all sections of Chapter 23 of the W.Va.Code including W.Va.Code, 23-4-10, the section under which the claimant filed her claim.
Obviously W.Va.Code, 23-4-1, and W.Va.Code 23-4-10 relate to the same subject matter, and in accord with the rule expressed in Owens-Illinois Glass Co. v. Battle, State Tax Commissioner, 151 W.Va. 655, 154 S.E.2d 854 (1967), we conclude that they should be read in pari materia.
In reading the two Code sections in pari materia the requirement of causal relationship between disease and employment which is established by W.Va.Code, 23-4-1, is carried into W.Va.Code, 23-4-10, and becomes one of the total definitional elements limiting the circumstances under which a dependent's award may be paid under W.Va.Code, 23-4-10. For this reason our decisions on the definition of "occupational disease" under W.Va.Code, 23-4-1, are pertinent to a causal relationship issue raised under W.Va.Code, 23-4-10.
In Bannister v. State Workmen's Compensation Commissioner, 154 W.Va. 172, 174 S.E.2d 605 (1970), we ruled that occupational disease means a disease incurred in the course of and resulting from employment. No ordinary disease of life to which the general public is exposed outside of employment shall be compensable unless it was proximately caused by the employment.
In the case before us the claimant introduced a death certificate indicating that the cause of the decedent's death was occupational pneumoconiosis. A subsequent autopsy revealed no evidence of occupational pneumoconiosis, but did reveal extensive evidence of other lung diseases.
Although the claimant introduced evidence showing that her deceased husband had been exposed in his employment to fumes from over one hundred noxious chemicals, she adduced no medical or other evidence demonstrating that the chemicals to which he was exposed could have caused the lung conditions which the autopsy of his body revealed.
In the Syllabus of Ratcliff v. State Compensation Commissioner, 146 W.Va. 920, 123 S.E.2d 829 (1962), we held in part:
"Where an employee files his application for workmen's compensation benefits, based on the occurrence of an occupational disease, other than silicosis, to entitle him to an award, he must establish that the disease was contracted in the course of and resulted from the employment;. . ."
This same rule applies to a widow's benefits based on an employee's death from occupational disease under W.Va.Code, 23-4-10. Here the Appeal Board concluded from the record that there was no evidence to connect the disease which caused the employee's death, as being contracted in the course of and resulting from his employment.
We have long recognized that:
"In order to reverse a finding of fact by the Workmen's Compensation Appeal Board it must appear from the proof upon which the board acted that the finding in question was plainly wrong." Point 1, Syllabus, Vento v. State Compensation Commissioner, 130 W.Va. 577, 44 S.E.2d 626 (1947); Syllabus, Pennington v. State Workmen's Compensation Commissioner, 154 W.Va. 378, 175 S.E.2d 440 (1970).
The findings of the Appeal Board not being plainly wrong, we affirm its decision.
Affirmed.
*866 McGRAW, Justice, dissenting:
I must dissent from the result reached in the majority opinion. While it is true that a finding of fact by the Appeal Board will, in general, not be disturbed unless clearly wrong, this rule has no application to a case where the facts are undisputed and will admit of reasonable inferences favorable to the claimant. Pirlo v. State Workmen's Compensation Commissioner, W.Va., 242 S.E.2d 452 (1978); Morris v. State Workmen's Compensation Commissioner, 135 W.Va. 425, 64 S.E.2d 496 (1951).
Given the remedial purpose behind the Workmen's Compensation law, this Court has uniformly held that in a workmen's compensation case the evidence should be construed liberally in favor of the claimant. Lanier v. State Workmen's Compensation Commissioner, W.Va., 238 S.E.2d 687 (1977); Sowder v. State Workmen's Compensation Commissioner, 155 W.Va. 889, 189 S.E.2d 674 (1972); Johnson v. State Workmen's Commissioner, 155 W.Va. 624, 186 S.E.2d 771 (1972); Fulk v. State Workmen's Compensation Commissioner, 112 W.Va. 555, 166 S.E. 5 (1932); Caldwell v. State Workmen's Compensation Commissioner, 106 W.Va. 14, 144 S.E. 568 (1928); Poccardi v. Public Service Commission, 75 W.Va. 542, 84 S.E. 242 (1915). The cause of an injury[1] may, therefore, be established without direct evidence, by circumstances and physical facts sufficient to warrant an inference that the injury was caused by the claimant's employment. Medical evidence is not always required to establish causation. Pennington v. State Workmen's Compensation, 154 W.Va. 378, 175 S.E.2d 440 (1970). Where no alternative grounds are advanced for the claimant's condition, the presumption should be resolved in favor of the employee rather than against him. Sisk v. State Workmen's Compensation Commissioner, 153 W.Va. 461, 170 S.E.2d 20 (1969).
In the present case it is undisputed that Clinton Hudson died of extensive lung disease. There is no evidence that he ever suffered from infirmity of the lungs prior to his employment or that he ever engaged in any non-employment activities which could have contributed to his condition. Mr. Hudson was employed as a weighmaster by Union Carbide from 1942 until his retirement in February of 1968. During this time his job consisted almost exclusively of filling fifty-five (55) gallon drums with chemicals. While on the job he was constantly exposed to toxic fumes. Some of the chemicals with which he worked required that he wear a gas mask; others were strong enough to burn through skin, clothing and shoes.[2]
*867 In October, 1970, two years after his retirement, Mr. Hudson died at the age of sixty-five. At that time the attending physician mistakenly described the cause of death as occupational pneumoconiosis. Based upon this mistaken information Mrs. Hudson, in pursuing death benefits, attempted to prove that her husband had indeed contracted occupational pneumoconiosis while working at Carbide. The evidence presented thus centered on dust content in the work place, rather than on the possibility of Mr. Hudson's exposure to chemicals having caused his lung disease. For this reason there was never any attempt to demonstrate a causal connection between Mr. Hudson's exposure to various chemicals and the lung condition which the autopsy of his body revealed.[3] Based upon this record, the Appeal Board denied benefits, holding that there had been no establishment of a "direct causal connection" between Mr. Hudson's exposure to chemicals and his death.
In light of the overwhelming evidence compelling an inference that Mr. Hudson's lung condition was caused by his employment at Carbide, resort by the Appeal Board to technicalities is unwarranted. In these circumstances, to deny Mrs. Hudson's claim ignores the liberality which the statute requires to effectuate its purpose. Its provisions indicate that all that is required is that a claim shall be made; so long as the form states with distinctness and particularity everything which can enter as an element into the composition of the claim *868 under the statute, benefits should be granted. Spaulding v. State Workmen's Compensation Commissioner, W.Va., 205 S.E.2d 130 (1974); Culurides v. Ott, 78 W.Va. 696, 90 S.E. 270 (1916).
The majority opinion sanctions a tragic result. The widow, Mrs. Hudson, though obviously entitled to benefits under the Act, is denied because of a physician's failure to state the proper cause of death of her husband, and her consequent failure to understand and establish an element in the actual cause of death. Benefits should not be denied on the basis of such technicalities. Even in a case where the facts concerning a claim are not sufficiently developed by the evidence to enable the Commissioner or the Court to arrive at the substantive merits of the claim, an order may be entered recommitting the case to the Commissioner for further development. Pripich v. State Compensation Commissioner, 112 W.Va. 540, 166 S.E. 4 (1932); Foughty v. Ott, 80 W.Va. 88, 92 S.E. 143 (1917).
Given the strength of the inference that Mr. Hudson's death was caused by lung disease contracted during the course of and as a result of his employment, I believe this case should be remanded to the Appeal Board and referred to the Commissioner so that petitioner can comply with the technical requirements of establishing a causal relationship between the death of Mr. Hudson, his lung condition, and chemical exposure.
This present Court has shown very high regard for the rights of the working people of this State. See, Flannery, Beeson, Bradley and Goddard, The Expanding Role of the West Virginia Supreme Court of Appeals in the Review of Workmen's Compensation Appeals, 81 W.Va.L.Rev. 1 (1978) [hereinafter cited as Flannery]. There has long been explicit recognition of the broad social purposes behind the Workmen's Compensation law and, accordingly, claims under the Act have been dealt with in a spirit of liberality. In the present case, these trends have been subverted by eight years of intense battle on the part of Union Carbideeight years spent solely in the crusade to deprive Mrs. Hudson of her widow's benefits.
Viewed against the historical backdrop, one can only hope that Union Carbide's "victory" represents an aberration. It will be a tragedy of unmatched proportions if decisions such as the one in this case come to represent the rule, rather than the exception. The rights of claimants under the Workmen's Compensation law must be protected from the erosion of strict construction and technicality. The purposes of the statute must not be lost in the clamor of corporate pontification and special interest rhetoric. See, Flannery, supra.
NOTES
[1] Technically, under the provisions of W.Va.Code § 23-4-1, benefits are only paid in the event an employee suffers a "personal injury." However, the same section makes it clear that "the terms `injury' and `personal injury' shall include occupational pneumoconiosis and any other occupational disease."

The section defines occupational pneumoconiosis as "a disease of the lungs caused by the inhalation of minute particles of dust." Any condition not related to dust must be analyzed as either an injury or an occupational disease.
For the purposes of the Workmen's Compensation law, an "occupational disease" is any disease incurred in the course of and resulting from employment. No ordinary disease of life to which the general public is exposed outside of the employment is compensable unless it is apparent to the rational mind, upon consideration of all the circumstances (1) that there is a direct causal connection between the conditions under which work is performed and the occupational disease, (2) that it can be seen to have followed as a natural incident of the work as a result of the exposure occasioned by the nature of the employment, (3) that it can be fairly traced to the employment as the proximate cause, (4) that it does not come from a hazard to which workmen would have been equally exposed outside of the employment, (5) that it is incidental to the character of the business and not independent of the relation of the employer and employee, and (6) that it must appear to have had its origin in a risk connected with the employment and to have flowed from that source as a natural consequence, though it need not have been foreseen or expected before its contraction. W.Va.Code § 23-4-1 [1976].
[2] Among the chemicals which Mr. Hudson handled during the course of his employment were the following: Amines, Acetone, Ketone, Anhydrades, numerous acids, and various chlorinated products, including Epichlorhydrin.

An appreciation of the conditions on the job site can be gained by resort to some of the evidence in the case. At a hearing before a trial examiner on February 20, 1973, the following testimony was adduced during the examination of George H. Slater, a co-worker of Mr. Hudson's, by counsel for the claimant:
Q. What kind of chemicals?
A. Well, there were amines, anhydrides, all kinds of solvents for paints, medicinal chemicals like isopropynol and propylene glycol, ethylene dichloride, ethyl ether; we shipped just everything the company mademethanol, cellosol, butyl acetate, butyl alcohol, ethyl acetateyou name it, we made it.
Q. Did most of these chemicals have fumes?
A. They did.
Q. Can you describe to me the fumes?
A. Well, they were very obnoxious. Actually, when you'd walk in the place in the morning, you've got about the last breath of real good air you're going to have for eight hours.
Q. Did you ever cough as a result of breathing these fumes?
A. Yes, sir, I've been run out of the building more times than you've got fingers and toes.
* * * * * *
Q. Are you saying then that all the fumes that were intended to go out did in fact not go out?
A. Absolutely not.
Q. Did you ever cough as a result of these fumes?
A. Oh, yes, yes, sir. I've got emphysema right now.
Q. Did your eyes burn?
A. Oh, yes, when you get in acidic hydride, they'll burn.
* * * * * *
[3] A post-mortem examination of Mr. Hudson's body revealed that he suffered from, among other conditions, chronic pulmonary emphysema, bronchiectasis, focal bronchopneumonia, and pleurisy. Related to these conditions, there was evidence of discrete nodular fibrosis (four fibroblastic nodules were discovered), blistering, and extensive pleural adhesions along both lungs.

These are conditions which one does not develop in the course of everyday, ordinary life. Bronchiectasis and emphysema are unusual in the modern world, seldom appearing as isolated conditions. When they do develop, it can usually be attributed to specific causal factors (i. e. emphysema has a strong correlation to cigarette smoking, not present in Mr. Hudson's case, and air pollution). This fact, together with the presence of lung adhesions and bronchopneumonia, compels the conclusion that Mr. Hudson's condition was not a coincidence. The pneumonia, in particular, can be specifically traced to inhalation of chlorine gases. 4A Gray's Attorney's Textbook of Medicine, Chapter 203, The Pneumonias (1975).
Mr. Hudson's lungs were inflamed and blistered, with fibrous nodules forming upon them. The bronchial tubes were inflamed and there was disruption of the alveoli, with extreme shortness of breath and impaired respiratory gas exchange. Portions of the lung tissue were given to development of hard fibrous matter, and the pleural sac surrounding the lungs had lost most of its moisture, thereby adhering to the lungs, preventing full contraction and increasing the difficulty of breathing. Once a combination of these symptoms develops to a certain point, there is no cure. Slow but steady deterioration, and eventual death, is inevitable. For more extensive discussion, see, 4A Gray's Attorney's Textbook of Medicine, Chapter 202, Bronchiectasis and Bronchiolectasis (1975); Chapter 203, The Pneumonias (1975); Chapter 204, Bronchitis and Emphysems (1975).