383 S.E.2d 516

Cecil v. HOULT

v.

**WORKERS' COMPENSATION COMMISSIONER and Jones Fur Service, Inc.**

No. 18582.

Supreme Court of Appeals of West Virginia.

July 7, 1989.

Frank C. Mascara, Fairmont, for Hoult.

Woodrow A. Potesta, Fairmont, for appellee.

PER CURIAM:

This is an appeal by the claimant, Betty L. Hoult, widow of Cecil Hoult, from the April 15, 1988 Workers' Compensation Appeal Board's affirmance of the Commissioner's order of August 18, 1987, which denied the claimant dependent's benefits for an occupational disease fatality. Since the claimant established an unrebutted, prima facie claim for dependent's benefits due to an occupational disease fatality when she offered evidence that her husband was ex-

posed to carbon tetrachloride[1] and benzene[2] vapors while working for the employer from 1935 until 1942 and died in 1985 of cardiorespiratory and renal failure, which have been linked to the prolonged inhalation of such vapors, we reverse the decision of the Appeal Board. *Powell v. SWCC*, 166 W.Va. 327, 273 S.E.2d 832 (1980); *Sansom v. SWCC*, 176 W.Va. 545, 346 S.E.2d 63 (1986).

The decedent, Cecil Hoult, worked from 1935 to 1971 for Jones Fur Service, described by its owner as a "wholesale" furrier business that repaired and refurbished furs. The decedent's only absence from the work place was from 1942 to 1946, during which time he served in World War II.

In August, 1981, Mr. Hoult, at 71, filed a claim for disability benefits. After his death, in 1985, the claim was treated by agreement of the parties as a dependent's benefits claim for an occupational disease fatality and all previously submitted evidence for Mr. Hoult's claim was resubmitted for the dependent's benefits claim.

Prior to his death, Mr. Hoult submitted two doctors' reports. The first report is that of treating physician, Dr. Pravin I. Patel, dated December 28, 1981, who had been treating the claimant for his heart problem (supraventricular tachyrhythmia). Following pulmonary tests and blood gas studies performed at the West Virginia University Medical Center which revealed rather severe chronic obstructive pulmonary disease (COPD), Dr. Patel concluded that Mr. Hoult's heart problem "is most likely secondary to his chronic restrictive and obstructive lung disease of rather severe intensity."

Mr. Hoult also submitted the February 15, 1982 report of lung specialist, Dr. John A. Bellotte. Dr. Bellotte reviewed Mr. Hoult's history of congestive heart failure, arteriosclerotic heart disease, diabetes mellitus, removal of a cancerous left breast in the 1960's, and a past history of minimal smoking prior to the removal of the breast. Dr. Bellotte also noted:

He has been exposed to carbon-tetrachloride, benzine and saw dust. Previously he has had problems with cough and sputum production.

I do not see any specific changes on his x-ray that I could definitely say are due to Pneumoconiosis, however, with his minimal smoking history and his rather severe pulmonary impairment, I cannot completely rule out the possibility that some of his pulmonary impairment may be related to his occupational history.

A hearing was held wherein Mr. Hoult, a co-worker, and the owner of Jones Fur testified.

From 1935 until 1942, Mr. Hoult worked in the cleaning room of Jones Fur for forty-eight hours per week. The size of the room was roughly 1800 cubic feet and contained a small exhaust fan, near the floor.

From 1935 through 1942, furs were cleaned through a "non-emersion" process, developed by the owner of Jones Fur, who also received a degree in chemical engineering in the 1920's. The process consisted of saturating pulverized (to the consistency of flour) maple wood chips with a chemical solution of 40% carbon tetrachloride, 60% benzol. A coat was covered with the solution, then spun in a drum, removed, and handbrushed. Coats were stored in a vault which contained benzene crystals. The benzene crystals emitted paradichlorobenzene, to kill moths.

During this period, 1935–1942, a former co-worker of Mr. Hoult testified that the cleaning solution produced substantial dust in the cleaning room. The solution also

---

1. Carbon tetrachloride is defined as "a clear, colorless, volatile liquid, $CCL_4$, once used as an anthelmintic [work killing agent]. Inhalation of its vapors can depress central nervous system activity and cause degeneration of the liver and kidneys." Dorland's *Medical Dictionary* at 260, (25th ed. 1974).

2. Benzene, also known as benzol, is defined as "a colorless volatile liquid hydrocarbon, $C_6H_6$, *obtained mainly as a by-product in the destructive distillation of coal, along with coal tar, etc.* It has an aromatic odor, and burns with a light-giving flame. It dissolves sulfur, phosphorous, iodine, and organic compounds. The fumes may cause fatal poisoning." Dorland's *Medical Dictionary* at 194 (25th ed. 1974).

emitted fumes. Employees vomited from inhalation of the fumes, and fainted when overexposed to them. He further added that occupants of an apartment building neighboring the cleaning room frequently complained of the dust and odor. Mr. Hoult testified that he frequently became dizzy and experienced difficulty breathing while working in the environment. He has consistently coughed phlegm since working for Jones Fur but did not seek medical treatment until 1981.

The employer testified that none of the employees who worked in the cleaning room had ever informed him of problems with regard to dust or fumes. The employer also contended that the cleaning of furs was seasonal. However, he did not offer any explanation for the full time employment of Mr. Hoult or his co-worker in the cleaning room, or list Mr. Hoult's other duties outside the cleaning room between 1935–42.

It was undisputed that when Mr. Hoult returned to Jones Fur in 1946, the employer had constructed a new, better ventilated facility and had switched from the chemical solution to a naphtha wash, which was far less vaporous. However, the chemical solution was still used on furs which were difficult to clean.

While the claim was pending, Mr. Hoult died at the age of 74. For four years prior to his death, he had frequently been admitted to the hospital for cardiac problems and had required oxygen twelve to fourteen hours per day.

In support of her evidence of occupational disease, the claimant also submitted two additional pieces of medical evidence.

First, claimant submitted the autopsy protocol, which lists the final anatomical diagnosis as:

Cardiorespiratory and renal insufficiency failure

Clinical gram-negative septicemia with hypotension [bacterial infection in the blood]

Chronic obstructive pulmonary disease with pneumonitis and bilateral pleural effusions

Severe coronary atherosclerosis with myocardial ischemic changes

Second, claimant submitted an American Lung Association publication, *Solvents* (1980), adapted from "Working with Solvents," a *National Institute for Occupational Safety and Health* publication, which reads, in pertinent part:

Excessive inhalation of solvent vapors may cause lack of coordination or drowsiness, which have no discernible permanent effects on health but which may increase the risk of accidents. In other cases, overexposure may result in serious damage to the blood, lungs, liver, kidneys, nervous system, or gastrointestinal tract, particularly if highly toxic or irritating solvents like benzene, carbon tetrachloride, carbon disulfide, and formaldehyde are used.

Benzene is well-known for its effect on the blood-forming tissue of the bone marrow, and strong evidence suggests a link between benzene exposure and leukemia. Inhalation of carbon tetrachloride may affect the normal functioning of the brain and cause dizziness, headaches, fatigue, drowsiness, and—in instances of severe exposure—unconsciousness. Extensive or continued overexposure to the solvent has, in some cases, resulted in liver and kidney damage.[3]

The employer offered no medical evidence whatsoever. By order dated August 18, 1987, the Commissioner denied the occupational disease claim because the death "was not the result of an occupational disease within the meaning of the Act."

The Appeal Board affirmed, finding that Mr. Hoult died of "severe coronary atherosclerosis and gram negative septicemia" which "did not result from [his] exposure to carbon tetrachloride and benzine in the workplace." The Appeal Board discredited Dr. Bellotte's statement that he could not rule out that some of the decedent's pulmo-

---

3. The publication does not reveal the quantities of exposure that cause injury to other body organs, nor does the publication reveal the latency period between such exposure and the subsequent damage to other body organs.

nary problems were related to his inhalation of the chemical vapors because, "the claimant was not continuously exposed to [the chemicals] for his employment periods."[4]

W. Va. Code, 23-4-1 [1976] distinguishes injury, occupational pneumoconiosis and occupational disease and further defines occupational disease as:

> [A] disease incurred in the course of and resulting from employment. No ordinary disease of life to which the general public is exposed outside of employment shall be compensable except when it follows as an incident of occupational disease as defined in this chapter. ... a disease shall be deemed to have been incurred in the course of or to have resulted from the employment only if it is apparent to the rational mind, upon consideration of all the circumstances (1) that there is a direct causal connection between the conditions under which work is performed and the occupational disease, (2) that it can be seen to have followed as a natural incident of the work as a result of the exposure occasioned by the nature of the employment, (3) that it can be fairly traced to the employment as the proximate cause, (4) that it does not come from a hazard to which workmen would have been equally exposed outside of the employment, (5) that it is incidental to the character of the business and not independent of the relation of employer and employee, and (6) that it must appear to have had its origin in a risk connected with the employment and to have flowed from that source as a natural consequence, though it need not have been foreseen or expected before its contraction.[5]

In Powell v. SWCC, 166 W.Va. 327, 273 S.E.2d 832, 19 A.L.R.4th 630 (1980), this Court addressed the claimant's burden in occupational disease cases.

■ Consistent with the remedial purpose and liberal construction of the act, in syllabus point 5 of Powell, we delineated the claimant's burden in establishing legal and medical causation for occupational disease claims:

> If studies and research clearly link a disease to a particular hazard of a workplace, a prima facie case of causation arises upon a showing that the claimant was exposed to the hazard and is suffering from the disease to which it is connected.

Specifically, in regard to medical causation we noted that death benefits are payable when the claimant produces substantial evidence that the occupational disease contributed to the covered employee's death. Powell v. SWCC, 166 W.Va. 327, 335, 273 S.E.2d 832, 836 (1986). In proving this causal connection, "[a] claimant in an occupational disease case is not required to negative all possible non-occupational causes of the disease." Syl. pt. 4, Powell, supra. Nor is the claimant required "to prove that the conditions of his employment were the exclusive or sole cause of the disease." Syl. pt. 3, Powell, supra.

■ In this case, the claimant proved that the decedent was exposed to carbon tetrachloride and benzene vapors 48 hours per week for roughly seven years. Claimant further introduced evidence that it is a medically accepted fact that prolonged inhalation of the vapors emitted from carbon tetrachloride and benzene are linked to renal and pulmonary problems. The decedent died of heart problems and an infection in his blood. The heart problems had, prior to his death, been linked to his pulmo-

---

**4.** This Court has previously noted that W. Va. Code, 23-4-1 [1976] contains the sole criteria for proving an occupational disease, and cannot be read to impose any additional requirements on claimants other than those in the statute. Powell v. SWCC, 166 W.Va. 327, 335, 273 S.E.2d 832, 836 (1986).

**5.** The statute continues, in regard to certain procedural matters:

> No award shall be made under the provisions of this chapter for any occupational disease contracted prior to the first day of July, one thousand nine hundred forty-nine. An employee shall be deemed to have contracted an occupational disease within the meaning of this paragraph if the disease or condition has developed to such an extent that it can be diagnosed as an occupational disease.

nary problems by Dr. Patel. Likewise, Dr. Bellotte who examined Mr. Hoult prior to his death "could not rule out the possibility that some of [his] pulmonary problems" were the result of his work environment. Both opinions were rendered prior to the autopsy which revealed gram negative septicemia and renal failure, as well as the previously diagnosed COPD.

At this point, claimant made a prima facie case for legal and medical causation under *Powell:* Scientific studies recognize that these chemical vapors are toxic and that "excessive" exposure to them causes renal and pulmonary problems. The claimant proved that the decedent inhaled the vapors for seven years and subsequently suffered pulmonary impairment and renal insufficiency which substantially contributed to the decedent's death from heart problems and the inability to fight off the infection, gram negative septicemia.

While the claimant did not produce a wealth of medical evidence on the matter, she sufficiently met the criteria of *Powell.*

In *Powell,* the widow of an employee seeking dependent's benefits for an occupational disease established that her husband worked (at some unspecified time) for fifteen years and was exposed on a weekly basis to asbestos. She then introduced recent studies which linked asbestos exposure to adenocarcinoma, a specific type of lung cancer. Finally, she introduced evidence that her husband died of adenocarcinoma. Despite the fact that her husband did not have asbestosis, and did smoke cigarettes, this Court found that she established a *prima facie* occupational disease claim under *W. Va. Code,* 23–4–1.

Prior to *Powell,* in *Charlton v. SWCC,* 160 W.Va. 664, 236 S.E.2d 241 (1977), this Court reversed an appealed finding and concluded that the claimant had adequately established the requisite causal connection for a compensable claim based on aggravation of a pre-existing disease. However, there was little medical evidence of record. The former Occupational Disease Medical Board found that "perhaps claimant's working in the mine water [containing an industrial cleaning solution] aggravated his pre-existing condition, Buerger's Disease," and a physician reported that the working condition "probably precipitated" massive skin damage to the claimant's feet. *Charlton,* 160 W.Va. at 666, 236 S.E.2d at 242.

Claimant's medical evidence is more akin to *Powell* and *Charlton* and distinguishable from *Hudson v. SWCC,* 162 W.Va. 513, 256 S.E.2d 864 (1979). In *Hudson,* the Appeal Board denied a claim for dependent's benefits due to occupational disease. We affirmed because there was a complete lack of medical evidence linking the decedent's inhalation of chemical vapors to his death.

The Commissioner concluded that the claimant's death was not due to an occupational disease. The Appeal Board concluded that the claimant was inadequately exposed to the chemical vapors. The employer produced absolutely no medical evidence upon which to base either of these findings. We have previously held that once a *prima facie* claim has been established by the claimant, and the employer fails to offer medical evidence to refute medical causation, the refusal of the claim for lack of medical causation is reversible error as it is based on "pure conjecture." *Sansom v. SWCC,* 176 W.Va. 545, 547, 346 S.E.2d 63, 65 (1986). *Cf. Payne v. SWCC,* 149 W.Va. 316, 140 S.E.2d 793 (1965) (employer's introduction of scientific samples that revealed the absence of silicon dioxide in harmful quantities at the workplace during periods of employment established that claimant was not exposed to the hazards associated with silica sand).

Since the claimant had established a prima facie case for the claim, and the employer did not offer any medical evidence to refute the claim, the decision of the Appeal Board is reversed and remanded with directions to find that the decedent had contracted an occupational disease which substantially contributed to his death.

Reversed and remanded with directions.