David CLEMENTS, Appellant
Below, Appellant,

v.

DIAMOND STATE PORT CORP.,
Appellee Below, Appellee.

No. 51,2003.

Supreme Court of Delaware.

Submitted: May 20, 2003.
Decided: Aug. 14, 2003.
Reargument Denied Sept. 23, 2003.

Glenn C. Ward, of Ramunno, Ramunno & Scerba, P.A., Wilmington, DE, for Appellant.

Francis X.D. Nardo and Susan A. List, of Tybout, Redfearn & Pell, Wilmington, DE, for Appellee.

Before VEASEY, Chief Justice, HOLLAND and STEELE, Justices.

HOLLAND, Justice:

This is an appeal from a judgment of the Superior Court. That judgment affirmed a decision of the Industrial Accident Board (the "Board"). The Board terminated the total disability benefits of David Clements (the "Claimant") retroactive to the date that Diamond State Port Corporation (the "Employer") filed a Petition to Terminate Benefits. Nevertheless, the Board did award the Claimant partial disability and expert witness fees.

The Claimant raises four issues for review on appeal to this Court. First, that the Board erred, as a matter of law, in concluding that the Employer's medical expert was better qualified than his treating physician to determine if the Claimant was risking further neurological damage by returning to work within restrictions. Second, that the Board's finding that the Claimant misled the treating physician regarding his condition and, therefore, the Claimant could not rely on the treating physician's total disability order constitutes an error of law and is not supported by substantial competent evidence. Third, that the Board erred, as a matter of law, when it terminated the Claimant's total disability benefits retroactive to the date the Employer's termination petition was filed. Fourth, in the alternative, that the Board's decision to terminate the Claimant's total disability benefits retroactive to the date of the filing is not supported by substantial competent evidence.

## Board Proceedings

On September 24, 2001 ("date of filing"), the Employer filed a Petition to Terminate Benefits. The petition alleged that the Claimant's total disability had ceased and that he was capable of returning to work in some capacity. At the time of the Petition to Terminate, the Claimant was receiving total disability payments pursuant to an agreement with the Employer. Such an agreement is legally equivalent to an award by the Board.[1]

On January 23, 2002, the Board held a hearing on the Employer's petition and rendered its decision on February 4, 2002. The Board terminated the Claimant's total disability benefits retroactive to the date of filing by the Employer. Nevertheless, the Board did award the Claimant partial disability benefits and expert witness fees.[2]

The Board determined that the Employer had met its burden of showing that the Claimant is not completely incapacitated and that the Claimant's total disability terminated as of September 24, 2001, the filing date of the Employer's petition.[3] Relying on the testimony of Dr. Townsend, who performed a medical examination of the Claimant at the Employer's request, the Board held that "the Claimant is physically capable of working within the restrictions set forth by Dr. Townsend."[4] Based on the Claimant's education and work experience, the Board concluded that the Claimant "appears employable on a *prima facie* basis, even with his physical restrictions." Because the Claimant had made no efforts to locate suitable employment, the Board determined that the

---

1. Del.Code Ann. tit. 19, § 2347. "Compensation payable to an employee, under this chapter, shall not terminate until and unless the Board enters an award ending the payment of compensation after a hearing upon review of an *agreement or* award ..." (emphasis added). *See Hamilton v. Trivits*, 340 A.2d 178 (Del.Super.1975)

2. *Clements v. Diamond State Port Corp.*, Board Hearing No. 1141580 (Feb. 4, 2002) at 13.

3. *Id.* at 8–9.

4. *Id.* at 10.

Claimant was not actually displaced.[5]

The Board further held that the Claimant "clearly has physical restrictions that could affect his earning capacity," and thus is partially disabled.[6] The Board received testimony from Robin L. Subers, a vocational counselor employed by Carter Works, Inc., concerning a labor market survey of prospective jobs within the Claimant's physical capabilities as described by Dr. Townsend. The Board held, pursuant to title 19, section 2325 of the Delaware Code, that the "Claimant's compensation rate for partial disability is $141.07 per week, effective from the date his total disability terminated."[7]

Upon examination of the Employer's pre-hearing written settlement offer, the Board concluded that the settlement offer equaled the amount awarded by the Board. Therefore, pursuant to section 2320, the Board ruled that the Claimant was not entitled to an award of attorney's fees.[8] The Board awarded the Claimant medical witness fees, however, in accordance with section 2322(e).[9]

The Claimant moved for reargument of the Board's decision. The Board denied the Claimant's motion for reargument finding "no basis to change its decision."[10] The Claimant filed a timely appeal with the Superior Court, which affirmed the Board's judgments. The Claimant has raised the same issues on appeal to this Court that were presented to the Superior Court.

### Compensation Agreement

On August 8, 1997, the Claimant suffered a back injury, consisting of a low back strain and sprain and a herniated disc, while working for the Employer. Following that accident, the Claimant and Employer entered into an agreement as to total disability benefits. On March 15, 1999, the Claimant's total disability was terminated. The parties agreed that the Claimant was capable of working in some capacity and entered into an agreement as to partial disability benefits. On February 21, 2001, the Claimant underwent back surgery and resumed total disability status by further agreement of the parties.

On June 28, 2001, Dr. Vaccaro, the Claimant's surgeon, issued a "return-to-work physical capacities sheet" indicating the Claimant could return to light duty work. Without returning to work, however, the Claimant consulted with his other treating physician, Conrad K. King, Jr., M.D., a pain management specialist. Dr. King determined that the Claimant remained totally disabled following the surgery by Dr. Vaccaro. Therefore, the Claimant continued to received total disability payments pursuant to the agreement with the Employer.

### Claimant's Physician–Total Disability Opinion

Dr. King testified before the Board by deposition on behalf of the Claimant. Dr. King first saw the Claimant in February 1999 and has seen him periodically since that time. Dr. King testified that on November 5, 2001, the Claimant appeared without an appointment. Prior to that, he had last seen the Claimant on January 18, 2001. Dr. King stated that on November

5. *Id.* at 10–11.
6. *Id.* at 11.
7. *Id.* at 12.
8. *Id.* at 12–13.
9. *Id.* at 13.
10. *Clements v. Diamond State Port Corp.,* Board Hearing No. 1141580 (April 4, 2002) at 4.

5, 2001, the Claimant related that he had disc surgery on February 21, 2001 performed by Dr. Alexander Vaccaro. The Claimant told Dr. King that, since the surgery, he continued to experience significant low back pain and ongoing right-lower extremity radicular symptoms.

Upon examination, Dr. King observed that the Claimant's "[r]ange of motion of the lumbar spine was limited to approximately 75 percent of normal in all planes. He had moderate spasm of the lumbar paraspinal muscles. Straight leg raising was negative at 75 degrees on the left, but positive at 60 degrees on the right." Dr. King testified that these results were better than at any time he had seen the Claimant since February 1999. Based on the objective findings after the physical examination, Dr. King ordered a repeat MRI. Dr. King testified that:

> The MRI performed on November 21, 2001, revealed a large right lateral disc herniation at L5–S1 partly surrounded by postoperative fibrosis. It revealed marked pressure on the dural sac in the right S1 nerve root. And the reviewing radiologist compared it to a previous study of August 2nd, 1999, and indicated that it represented significant worsening since the last exam performed on 8–2–99.

Dr. King testified that the same radiologist reviewed the August 1997 MRI, the August 1999 MRI and the November 2001 MRI.

Dr. King next saw the Claimant on December 31, 2001. At that time, Dr. King issued a disability note stating, "[the Claimant] was totally disabled until he saw [Dr. King] in follow-up on February 25th." Based on both objective and subjective findings, Dr. King classified the Claimant's low back condition as severe and characterized it as failed back syndrome.

Dr. King opined that the Claimant would require another surgical procedure. He testified that he "made arrangements to have [the Claimant's] records sent to Dr. James Campbell who is a noted neurosurgeon at Johns Hopkins" and that it is "Dr. Campbell's procedure to review records and make a decision on whether or not he's willing to see a patient . . . ." Dr. King stated that if the Claimant were to ignore his instructions and return to work, in any capacity, he would risk further complications and a worsening of his condition. Dr. King testified that the wrong type of activity could cause his condition to "progress to cauda equina syndrome which led to his initial surgery back in 2001."

Dr. King was "unaware of whether [the Claimant] was taking any prescription medication during the period of time" after June 28, 2001 or if the Claimant had received any medical treatment from June 28, 2001 to November 2001. Dr. King testified that at the time of examination the Claimant was not suffering from sexual or urological dysfunction. At that time, the claimant did not require any assisting device such as a cane, a wheelchair or a walker.

### Employer's Physician–Partial Disability Opinion

John B. Townsend, III, M.D., a Board certified neurologist, testified by deposition on behalf of the Employer before the Board. Dr. Townsend saw the Claimant for the first time on February 25, 1998. After the performance of a MRI, Dr. Townsend diagnosed a large central and right lateral disc herniation at the level of L5–S1 and recommended that the Claimant undergo low back surgery at that time.

Dr. Townsend next saw the Claimant on February 15, 1999. Upon examination, with regard to the low back, Dr. Townsend observed that the Claimant had restricted

ranges of motion and muscle tenderness in the right sacroiliac region. Dr. Townsend testified that the Claimant told him "he couldn't lie down and do [the] Patrick's maneuver or straight leg raising at that time." Dr. Townsend testified that on this occasion he performed a neurologic examination and that the Claimant:

> ... had normal strength in the upper and lower extremities. He could do heel and toe walking, but did so very slowly. He had normal deep tendon reflexes, except that he had a one plus right ankle jerk compared to two plus on the left. And he had some diminished sensation to pin-prick and temperature in the L5 distribution.

Dr. Townsend concluded that the Claimant was capable of doing sedentary to light-duty work, with the opportunity to change positions on an hourly basis and that at the time the Claimant was still a candidate for surgery.

Dr. Townsend last examined the Claimant on January 2, 2002. Dr. Townsend testified that based on a physical exam and a range of motion test performed by a digital dual inclinometer, the Claimant's range of motion was slightly improved, but still limited. Dr. Townsend observed that the Claimant was able to lie down for the Patrick's maneuver and had no difficulty doing the heel walk; but the Claimant did complain of difficulty when walking on his toes.

Dr. Townsend noted that the Claimant had an absent ankle jerk reflex and diminished sensation to a pinprick in the right foot. At this time, Dr. Townsend stated that the Claimant had no urinary or bladder complaints and did not require any type of aid to walk. Dr. Townsend opined, based on his clinical findings, that the Claimant continued to suffer from mild S1 radiculopathy as evidenced by mild weakness, some loss of sensation and some pain complaints.

Dr. Townsend testified that the Claimant had improved to some extent since the February 1999 examination but that he was still a surgical candidate. According to Dr. Townsend, the Claimant's condition in January of 2002 was similar to his condition in February of 1999, and Dr. Townsend believed, as he did then, that the Claimant could work in a light to sedentary capacity with restrictions.

Upon review of a labor market survey prepared by the Employer, Dr. Townsend opined that from a physical standpoint each of the ten (10) employment positions identified were suitable for the Claimant to perform on a full-time basis. Furthermore, when asked whether he had an opinion whether the Claimant would have continuously been able to work in a sedentary to light-duty capacity since June 28, 2001, Dr. Townsend testified that,

> ... based on the fact that [the Claimant] did have a release to work at that time there would be no reason why he couldn't have worked in a light sedentary capacity. And, again, at least after my evaluation, given that he looked quite similar to the way he did when I released him previously, I saw no ongoing reason why he still couldn't work in that capacity.

### Claimant's Testimony

The Claimant testified that he is thirty-five years old and has a high school education. He feels that he is articulate and has leadership skills. He stated that he participates in a study-discussion group concerning the principles and concepts of the political economy. The Claimant's job experience includes: a forklift truck operator, a field administrator performing data entry for Guardian Environmental Group, and sales and management encompassing

a three state territory for 21st Century Concepts. The Claimant testified since his operation he has

... been experiencing extreme chronic pain in the lower back radiating and coming up into [his] legs which is a symptom that has increased that [he] didn't have the problems before radiating into [his] left leg. [He has] experienced additional numbness into [his] right foot and subsequently [he has] chronic pain on a daily basis .... [He is] experiencing difficulty with erectile dysfunction and chronic pain in the testes.

Increasingly, he feels a urinary urgency but with no actual result. This symptom existed prior to the surgery, went away after surgery, but has returned.

The Claimant testified that he did not tell Dr. King in November or December 2001 that he was experiencing erectile and urinary dysfunction. He could not recall telling Dr. King about the pain radiating down his left lower extremity. The Claimant stated that he sleeps for about forty-five minutes at a time and experiences spasm and numbness if he rolls over onto his back.

The Claimant testified that the pain interferes with his daily activities. He explained that tasks such as brushing his teeth and putting on his shoes, socks and pants are difficult because of the pain. In addition, the Claimant explained that he lives alone and basic housekeeping tasks such as doing laundry or taking out the garbage required the aid of friends and neighbors.

The Claimant testified that he is awaiting confirmation of a scheduling date with a specialist in Baltimore. If the doctor recommends surgery, he initially avowed to "absolutely follow the doctor's recommendation" but later testified that he couldn't rule out getting a second opinion. The Claimant testified that before his first surgery he was told by a neurosurgeon to explore all the possibilities and to get other opinions. The Claimant explained that before he submitted to the first surgery, because of the risk of paralysis or loss of sexual function, he tried several types of rehabilitation including chiropractic care, physical therapy and aquatic therapy.

When asked if he felt capable of returning to work at this time, the Claimant stated "[n]ot at this time." The Claimant testified that physically he:

... would be unable to be in a position for 8 hours or 4 hours being subjected to a work place environment and not continuing to try and rehabilitate myself and put myself in a position to recoup that presents a situation for me where I could further my injury along and I would not want to be doing something that would be inconsistent with the recommendation of the doctor ....

The Claimant stated that his last visit to Dr. Vaccaro was in March 2001 and that he did not learn that Dr. Vaccaro had released him to work in June 2001 until six months later. He agreed that he received the Employer's termination petition in September 2001.

The Claimant testified that he had not seen another doctor until he went to see Dr. King in November 2001. In explanation as to why he never went back to see Dr. Vaccaro the Claimant stated "if I were experiencing some type of difficulty I would have been back to [Dr. Vaccaro] or possibly a different neurosurgeon." During the time period from March 2001 to November 2001, the Claimant testified that he took no prescription medication, only over-the-counter medications when needed. The Claimant classified his visit to Dr. King in November 2001 as an "emergency situation" because he felt his condition had worsened.

### Conflicting Medical Expert Opinions

The Claimant's first contention on appeal challenges the Board's decision to accept Dr. Townsend's medical opinion that the Claimant was only partially disabled rather than Dr. King's opinion of total disability. According to the Claimant, the Board erred, as a matter of law, in concluding that Dr. Townsend was better qualified than Dr. King to determine if the Claimant was risking further neurological damage by returning to work within restrictions. The Claimant argues that the "[Board's] rejection of Dr. King's total disability opinion because it determined Dr. Townsend was 'better qualified' to assess the risk of further potential worsening of the Claimant's disc" "violated the statutory and absolute right of the Claimant to treat with and follow the advice of a physician of his own choosing." Alternatively, the Claimant asserts that there exists no substantial evidence to support the Board's conclusion that Dr. Townsend was 'better qualified' than Dr. King. We have concluded that both of those contentions are without merit.

In this case, there were two competing expert opinions. Dr. King, the treating physician and a pain management specialist, testified on behalf of the Claimant. Dr. Townsend, a neurologist, testified on behalf of the Employer. The Board concluded that the opinion of the neurologist, Dr. Townsend, was more persuasive than that of the pain management specialist, Dr. King.

Under Delaware law, "an experienced practicing physician is an expert, and it is not required that he be a specialist in the particular malady at issue in order to make his testimony as an expert admissible."[11] The weight to be given to the expert testimony of a treating physician, however, is for the Board to determine, as the trier of fact.[12] In the absence of agreement between medical experts, the Board properly relied on all the record evidence to reach its determination to accept Dr. Townsend's opinion.

The Board explained its reasons for accepting the expert opinion of Dr. Townsend, rather than that of Dr. King, as follows: first, "Dr. King, a pain management specialist, opined that the Claimant should be considered totally disabled *until he had seen a neurosurgeon.* Dr. Townsend, on the other hand, is a neurologist." Second, "[Dr. Townsend] examined the Claimant and was aware of the results of the November 2001 MRI" and had evaluated the Claimant in 1999. Third, "Dr. Townsend is better qualified to determine if the Claimant is risking further neurological damage by returning to work within the restrictions he listed."

This Court has consistently held that it is the Board's function to resolve conflicts in medical testimony.[13] The Board did not err, as a matter of law, in concluding that Dr. Townsend was better qualified than Dr. King to determine if the Claimant was risking further neurological damage by returning to work within restrictions. The Board set forth the factual basis for its conclusion that Dr. Townsend's testimony was more persuasive. Those factual findings are supported by the record.[14] Ac-

---

11. *DiSabatino Brothers, Inc. v. Wortman,* 453 A.2d 102, 106 (Del.1982) (citations omitted).

12. *Board of Public Ed. in Wilmington v. Rimlinger,* 232 A.2d 98, 100 (Del.1967).

13. *Carey v. H & H Maintenance, Inc.,* 2001 WL 985114, at *2 (Del.Super.) (citing *Lindsay v. Chrysler Corp.,* Del.Super., C.A. No. 94A–04–005, Barron, J. (Dec. 7, 1994)).

14. *See Carey v. H & H Maintenance, Inc.,* 2001 WL 985114 at *2 (Del.Super.) (citing *Lindsay v. Chrysler Corp.,* Del.Super., C.A. No. 94A–04–005, Barron, J. (Dec. 7, 1994)).

cordingly, we have determined that the Claimant's first argument is without either legal merit or factual record support.

### Claimant's Reliance Proper

�n As a general rule, "[t]he credibility of the witnesses, the weight of their testimony, and the reasonable inferences to be drawn therefrom are for the Board to determine."[15] It was also within the discretion of the Board to evaluate the credibility of the Claimant's testimony. In this case, the Board determined that the Claimant was not entirely credible because the symptoms he described to the Board were not the same symptoms he had related to either Dr. King or Dr. Townsend. The Board also noted that the Claimant had not taken any prescription medication from March 2001 to November 2001 and had not sought medical care.

▌ It is well established that the Board cannot substitute its judgment to nullify the objective findings of a medical expert that fully support the claimant's subjective complaints.[16] Where a medical expert's opinion depends primarily upon the credibility of the claimant's subjective complaints, however, and the Board determines that those subjective complaints are not credible, the Board may reject the medical expert's conclusion.[17] Nevertheless, the claimant is entitled to rely upon the medical expert's opinion until it is rejected by the Board.

In this case, Dr. King characterized the Claimant's condition as failed back syndrome with objective and subjective evidence of ongoing problems. Although the

Board could not nullify the objective findings of Dr. King, it could evaluate the credibility of the Claimant and the weight to be accorded to Dr. King's opinion in reliance on the Claimant's subjective complaints. The Board found that the Claimant's subjective complaints and incomplete medical history misled Dr. King regarding his condition. Consequently, the Board held that the Claimant could not rely on Dr. King's "no work" total disability order. This finding resulted in the Board's determination that the Claimant was not a displaced worker. Thus, according to the Board, the Claimant should have been looking for work with restrictions notwithstanding Dr. King's no work order and the total disability agreement between the parties.

■ The Claimant argues that the Board's finding that the Claimant's subjective complaints misled Dr. King regarding his condition, and therefore the Claimant could not rely on Dr. King's total disability order, constitutes an error of law. We agree that holding by the Board constituted an error of law because in *Gilliard–Belfast*, this Court held "that a person who can only resume some form of employment by disobeying the orders of his or her treating physician is totally disabled, at least temporarily, regardless of his or her capabilities."[18] The rationale for this Court's holding in *Gilliard–Belfast* was based upon the operative fact that, in the medical opinion of the claimant's treating physician, the claimant was totally disabled.

**15.** *Coleman v. Dept. of Labor,* 288 A.2d 285, 287 (Del.Super.1972).

**16.** *Pusey v. Natkin & Co.,* 428 A.2d 1155 (Del. 1981) (holding that competent unrebutted medical evidence cannot be ignored by the board).

**17.** *Breeding v. Contractors–One–Inc.,* 549 A.2d 1102, 1104 (Del.1988); *Sears, Roebuck & Co. v. Farley,* 290 A.2d 639, 641 (Del.1972) citing *Debernard v. Reed,* 277 A.2d 684 (Del.1971).

**18.** *Gilliard–Belfast v. Wendy's, Inc.,* 754 A.2d 251, 254 (Del.2000).

That rationale is directly applicable to this case. Medical doctors must always make a diagnosis on the basis of all available data, including the patient's subjective complaints, as measured whenever possible by objective findings that are available upon physical examination and testing. Although there are exceptions, treating physicians are not easily misled into making a medical determination of total disability by malingerers or patients with exaggerated subjective complaints that defy confirmation by an objective physical examination or test.

The Claimant's general right to rely upon his treating physician's total disability opinion, especially while a Board award or agreement is in effect, means that the Claimant had no obligation to either return to work on a limited basis with the Employer or to look for other employment until the Board makes that determination. Accordingly, the Board erred, as a matter of law, in concluding that the Claimant's failure to look for work was relevant to the displaced worker issue. The Claimant was required only to return to work on a restricted basis or to seek other employment following a Board determination that he was no longer totally disabled.

■ The Board's holding that the Claimant could not rely on the no work order of his treating physician would place the Claimant in the same position that this Court held was untenable in *Gilliard–Belfast*. The Claimant would have to either disregard the no work order of the treating physician at the risk of personal injury or follow the advice of the treating physician with the risk of losing benefits retroactively. Once again, we hold that when the treating physician renders a no work order—even if the employer's physician disagrees with the order—the claimant is totally disabled for the purpose of the Delaware Workers' Compensation statute until the Board resolves that issue in favor of the employer.

It is not unusual for medical experts to have a legitimate difference of opinion about a claimant's total disability even if both medical experts agree about the subjective complaints, objective physical findings, and test results. If the treating physician adheres to the view that the claimant is totally disabled, then as this Court held in *Gilliard–Belfast*, "a person who can only resume some form of employment by disobeying the orders of his or her treating physician is totally disabled, at least temporarily regardless of his or her capabilities." [19] It is then incumbent upon the employer to file a Petition to Terminate with the Board, as the employer did in this case. Until the issue of total disability is resolved by the Board, however, the claimant is entitled to follow the no work instructions of the treating physician. Consequently, the Board's determination that the Claimant was not a displaced worker should have been reversed by the Superior Court and remanded for reconsideration.

### *Employer's Protective Statutory Rights*

■ When an employer disputes a total disability determination from the claimant's treating physician, as in this case from Dr. King, the statute requires a claimant to submit to a separate medical examination, at the employer's request. [20] The employer's statutory right to request a separate medical examination provides the employer with a form of double protection. First, it provides the employer with an opportunity to submit the claimant's subjective symptoms to enhanced objective

---

**19.** *Id.*

**20.** Del.Code Ann. tit. 19, § 2343.

scrutiny by another medical expert. Second, it permits the employer to ascertain whether there is a genuine divergence of opinion between the medical experts with regard to the claimant's total disability status, even if they are in agreement about the subjective and objective manifestations of the claimant's condition. If the medical expert selected by the employer concludes that the claimant is not totally disabled, as Dr. Townsend did in this case, the basis for that medical conclusion should be made known to the treating physician. If the treating physician adheres to his or her original determination of total disability, after being advised of the employer's medical expert's reasons for reaching a different opinion, the employer must file a Petition to Terminate Benefits and the matter must be resolved by the Board.

Thereafter, although the Claimant's right to receive total disability benefits continues after the petition to terminate is filed, those benefits are then paid by the Secondary Fund rather than the Employer.

> [A]n employee is entitled to compensation until there is a finding that he is no longer entitled to it, was implemented by providing for the continuation of the employee's compensation during the pendency of the proceedings to be paid out of the Fund. The legislative purpose was to assure continued compensation to the injured employee until he is found not to be entitled to receive it, and the burden of bearing the cost of such compensation if the employee is ultimately determined not to be entitled to it was placed upon the Fund. Of course, it provided for reimbursement to the Fund by the employer if it is ultimately determined that the employee is still entitled to compensation.[21]

If the Board resolves the conflict between the medical experts in favor of the employer, the claimant's total disability status ends on the date of the Board's determination. That was the Board's ruling in this case. If the Board determines that the Claimant remains totally disabled, however, the Employer must reimburse the Secondary Fund for payments made after the date of filing.

In this case, the Board's decision that it had the statutory authority to terminate the Claimant's total disability status as of the date of filing was correct, as a matter of law. The statutory scheme is consistent with this Court's holding in *Gilliard–Belfast* because it contemplates that the Claimant will follow the no work order of a treating physician but relieve the successful employer from the cost of paying total disability retroactively to the date of filing.

### Evidence Supports Retroactive Termination

■ The Claimant's last argument is that the Board's decision to terminate the Claimant's total disability benefits retroactive to the date of the filing is not supported by substantial competent evidence. The Claimant asserts that Dr. Townsend did not examine the Claimant until January 2, 2002, and therefore, that date provides the earliest competent evidence of the Claimant's work capabilities. The Claimant also argues that Dr. Vaccaro's June 2001 release for work cannot be considered, as evidence for the purpose of fixing a termination date because it was not moved into evidence and Dr. Vaccaro was not called as an expert to testify.

The Board noted that "[w]hile contemporaneous medical examinations would have been preferable, 'medical evidence is not the only evidence the Board may rely

21. *Hamilton v. Trivits*, 340 A.2d 178, 179–80 (Del.Super.1975).

on in making its factual determinations with respect to the Claimant's injury.'" According to the Superior Court, the evidence before the Board indicated "(1) the Claimant received no medical treatment at all between March 2001 and November 2001; (2) the Claimant required no prescriptions during this time; (3) Dr. Townsend testified that the Claimant could have worked at least sedentary duty given that he presented similarly, if not better than, he had when Dr. Townsend examined him in 1999; (4) Dr. King testified that the Claimant's physical examination was improved in November of 2001 as compared to when he saw him in 1999 and when he opined that the Claimant was able to work in a sedentary to light duty capacity." Based upon that evidence, the Superior Court held that the Board's decision to terminate the Claimant's total disability benefits retroactive to the date of the filing was supported by substantial evidence. This Court has concluded that the Superior Court's determination is supported by the record and is the product of a rational deductive process.

### Conclusion

The judgments of the Superior Court are affirmed except for the judgment affirming the Board's determination that the Claimant was not a displaced worker. That issue must be remanded to the Board for reconsideration in accordance with this opinion. Jurisdiction is not retained.