# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

JENNIFER L. WINDLE,                )
                                   )
    Employee-Appellant,            )
                                   )
v.                                 )    C.A. No. N16A-10-009 JRJ
                                   )
STATE OF DELAWARE,                 )
                                   )
    Employer-Appellee.             )

Date Submitted: March 30, 2017
Date Decided: June 14, 2017

## ORDER

This is an appeal from the Industrial Accident Board ("Board"). Employee-Appellant Jennifer L. Windle appeals the Board's September 27, 2016 Decision denying Windle's Petition to Determine Compensation Due.[1] Upon consideration of Windle's appeal;[2] Employer-Appellee the State of Delaware's opposition thereto;[3] and the record in this case, the Court hereby finds as follows:

1. On February 17, 2015, Jennifer Windle suffered a compensable injury to the cervical spine while performing snow removal work in the course of her employment as a custodian in the Christina school district. Her employer, the State

---

[1] Decision on Petition for Determination of Compensation Due, Hearing No. 1425699 ("Board Decision") (Trans. ID. 59751850).

[2] Employee-Appellant's Opening Brief on Appeal of the Industrial Accident Board's Decision Dated September 27, 2016 ("Windle Op. Br.") (Trans. ID. 60187719); Employee-Appellant's Reply Brief on Appeal of the Industrial Accident Board's Decision Dated September 27, 2016 (Trans. ID. 60324137).

[3] Answering Brief of Appellee, State of Delaware in Support of the Industrial Accident Board's Decision of September 27, 2016 (Trans. ID. 60268174).

of Delaware, acknowledges that Windle suffered a compensable injury, but maintains that that injury was a cervical strain that was resolved by no later than November 11, 2015.[4] Consequently, when Windle sought medical treatment expenses for a June 2016 cervical spine surgery and total disability benefits, the State refused on the basis that the compensation sought is not causally related to the February 17, 2015 work accident.

2. On April 22, 2016, Windle filed a Petition for Determination of Compensation Due, and on September 6, 2016, the Board held a hearing.[5] The Board considered the testimony of: (1) Dr. James Zaslavsky, an orthopedic surgeon, who proposed the June 2, 2016 cervical spine surgery and opined that it is causally related to the February 17, 2015 work accident;[6] (2) Windle; and (3) Dr. Stephen Fedder, a neurosurgeon, who opined that any injury Windle sustained from the February 17, 2015 work accident was resolved by no later than November 11, 2015.[7]

3. Windle's medical history, which Dr. Zaslavsky and Dr. Fedder addressed in their testimony, is as follows. In 2008, Dr. Eric Tamesis, a rheumatologist, ordered that Windle receive a cervical spine X-ray in response to complaints of

---

[4] *Id.* at 3–4.
[5] September 27, 2016 Hearing Transcript ("Hearing Tr.").
[6] August 30, 2016 Deposition of James Zaslavsky, D.O., admitted as Claimant's Exhibit 1 ("Dep. Dr. Zaslavsky").
[7] August 29, 2016 Deposition of Stephen L. Fedder, M.D., admitted as Employer's Exhibit 2 ("Dep. Dr. Fedder").

2

neck pain.[8] Dr. Fedder testified that the 2008 X-ray showed a normal cervical curve with minimal degenerative changes, if any.[9]

4. Beginning in November 2009, Windle received treatment from her primary care physician, Dr. Hasan, relating to joint pain, knee pain, and low back pain.[10]

5. On September 20, 2010, Dr. Hasan recorded that Windle had left shoulder pain traveling down into her elbow and arm,[11] and at some point, Dr. Hasan recorded a diagnosis of left carpal tunnel syndrome and left ulnar neuropathy.[12] Windle denied having any history of left arm symptoms and testified that Dr. Hasan's records incorrectly indicate that she experienced left arm issues, rather than right arm issues.[13]

6. In 2011, Dr. Hasan recorded complaints of neck pain.[14] Dr. Hasan referred Windle to physical therapy, and Windle reported to Dr. Hasan that her

---

[8] Board Decision at 7; Dep. Dr. Zaslavsky at 47:4–50:1.
[9] Board Decision at 14–15; Dep. Dr. Fedder at 14:4–22.
[10] Board Decision at 7; Dep. Dr. Zaslavsky at 51:1–9.
[11] Board Decision at 7; Dep. Dr. Zaslavsky at 52:9–12.
[12] Board Decision at 7; Dep. Dr. Zaslavsky at 52:13–16.
[13] Board Decision at 11; Hearing Tr. at 53:3–11, 55:1–17. In support of this assertion, Windle testified that she was certain she reported right arm issues because the issues arose from her work as a deli slicer and the slicer machine could only be operated with the right hand. Board Decision at 11; Hearing Tr. at 53:3–11, 55:1–17.
[14] Board Decision at 7; Dep. Dr. Zaslavsky at 53:2–11.

back and neck pain remained unresolved despite twelve sessions of physical therapy.[15] Dr. Hasan then ordered an MRI.[16]

7. Dr. Zaslavsky testified that the 2011 MRI showed moderate disk osteophyte complex at C4–5, with C5–6 appearing normal.[17] Dr. Fedder testified that the 2011 MRI showed a mild amount of mass effect in the front of the spinal cord at C4–5, with C5–6 and C6–7 appearing unremarkable.[18] Comparing the 2011 MRI to the 2008 X-ray, Dr. Fedder testified that there was an interval increase in degenerative disease consistent with the natural history of degenerative disease of the spine.[19]

8. In 2012, Dr. Witherell diagnosed Windle with cervical radiculopathy at C6–7 and provided Windle with a cervical injection.[20] Windle testified that the cervical injection administered by Dr. Witherell helped her and that after receiving the injection she was fine.[21]

9. In 2013, Windle sustained a work injury, injuring her neck and low back.[22] In response to that accident, Windle went to physical therapy.[23] From

---

[15] Board Decision at 7; Dep. Dr. Zaslavsky at 53:12–54:7.
[16] Board Decision at 7; Dep. Dr. Zaslavsky at 53:22–54:10.
[17] Board Decision at 4, 7; Dep. Dr. Zaslavsky at 20:21–21:4.
[18] Board Decision at 15; Dep. Dr. Fedder at 19:12–20:3.
[19] Board Decision at 15; Dep. Dr. Fedder at 14:23–15:13.
[20] Board Decision at 7; Dep. Dr. Zaslavsky at 54:16–55:5, 89:16–23; Dep. Dr. Fedder at 17:23–18:15.
[21] Board Decision at 9; Hearing Tr. at 43:2–14.
[22] Board Decision at 9; Hearing Tr. at 43:15–18; Dep. Dr. Fedder at 18:6–14.
[23] Board Decision at 9; Hearing Tr. at 43:19–20.

sometime in 2013 through at least July 11, 2014, Dr. Hasan treated Windle for neck pain.[24]

10. On February 17, 2015, Windle was injured while performing snow removal duties, which included lifting a snow shovel and raising and lowering a tractor plow with a lever.[25] Windle testified that her job was very physical, and she worked full duty up until the accident.[26] Following the accident, Windle sought care from Dr. Hasan. Windle reported neck pain, shoulder pain, left arm pain, and left hand pain.[27] Dr. Hasan provided Windle with prescriptions for gabapentin and Flexeril.[28]

11. On March 6, 2015, Windle presented to one of Dr. Zaslavsky's partners at First State Orthopaedics, Dr. Ginsberg.[29] Windle relayed to Dr. Ginsberg that she continued to work full time but was struggling.[30] Dr. Ginsberg recorded Windle's complaints of left-sided neck pain radiating into the scapular region, right trapezius region, left triceps muscle, left hand, and fifth and fourth fingers.[31] Dr. Ginsberg also documented a negative Spurling's test and decreased sensation over

---

[24] Board Decision at 8; Dep. Dr. Zaslavsky at 56:3–9.
[25] Board Decision at 3; Hearing Tr. at 44:24–45:3.
[26] Board Decision at 10; Hearing Tr. at 44:14–23.
[27] Board Decision at 10; Dep. Dr. Zaslavsky at 56:18–57:11.
[28] Board Decision at 3; Dep. Dr. Zaslavsky at 7:9–13.
[29] Board Decision at 2; Dep. Dr. Zaslavsky at 6:2–6.
[30] Board Decision at 3; Dep. Dr. Zaslavsky at 10:1–5.
[31] Board Decision at 3, 13–14; Dep. Dr. Zaslavsky at 8:7–18.

C6 and C7.[32] On physical exam, Dr. Ginsberg found evidence of decreased sensation and some weakness in Windle's left arm.[33]

12. With regard to Windle's first meeting with Dr. Ginsberg, Dr. Zaslavsky testified that while Windle had a history of cervical complaints, she did not have a documented history of grip weakness or shooting pains down the arm related to the cervical spine.[34] Dr. Fedder noted that, while Dr. Ginsberg described pain in the left neck and weakness in the left hand that indicate C7 radiculopathy, Dr. Ginsberg also recorded complaints of pain in Windle's fourth and fifth fingers that indicate C8 or ulnar nerve pathology.[35]

13. Following Windle's March 6, 2015 appointment with Dr. Ginsberg, she attended physical therapy, but on April 15, 2015, Windle continued to report pain.[36] Dr. Ginsberg scheduled a C7 selective nerve root block and asked Windle to follow up with Dr. Zaslavsky.[37] On April 20, 2015, Dr. Ginsberg placed an injection on Windle's C7 nerve root, which did not resolve Windle's pain.[38]

14. During this time, Windle underwent an MRI. Dr. Zaslavsky testified that the 2015 MRI showed herniated discs at C5–6 and C6–7 with left-sided

---

[32] Board Decision at 4, 13–14; Dep. Dr. Zaslavsky at 8:20–24.
[33] Board Decision at 4, 13–14; Dep. Dr. Zaslavsky at 9:1–10.
[34] Board Decision at 3; Dep. Dr. Zaslavsky at 7:23–8:6.
[35] Board Decision at 14; Dep. Dr. Zaslavsky at 17:2–15.
[36] Board Decision at 4: Dep. Dr. Zaslavsky at 10:17–24.
[37] Board Decision at 4; Dep. Dr. Zaslavsky at 11:6–12:7.
[38] Board Decision at 4; Dep. Dr. Zaslavsky at 11:16–12:23.

6

foraminal stenosis.[39] Dr. Zaslavsky described the herniation as compressing the spinal cord and the nerves leaving the spinal cord at the C5–6 level.[40] Dr. Fedder testified that the 2015 MRI showed a two to three millimeter protrusion with mild stenosis at C4–5, a two millimeter protrusion at C5–6, and a disc bulge at C6–7 "with a shallow, left-sided foraminal two-three protrusion."[41] According to Dr. Fedder, while the C4–5 and C5–6 protrusions were trivial and clinically irrelevant, the changes from the 2011 MRI to the 2015 MRI were degenerative findings.[42]

15. On May 6, 2015, Windle met with Dr. Zaslavsky. Among other things, Dr. Zaslavsky's records describe grade 4 over 5 weakness of the left intrinsic muscles, wrist flexors, and wrist extensors, as well as a positive Hoffman's reflex.[43] Dr. Fedder testified that the weakness as described, combined with the positive Hoffman's reflex, may suggest myelopathy, but Windle's MRI did not suggest the possibility or probability of myelopathy.[44]

16. Dr. Zaslavsky recommended surgery, which Windle declined, so Dr. Zaslavsky told Windle to return if the pain became unbearable.[45] Windle did not seek treatment from Dr. Zaslavsky again until March 2, 2016.[46] In the interim,

---

[39] Board Decision at 4; Dep. Dr. Zaslavsky at 13:15–24:21.
[40] Board Decision at 4; Dep. Dr. Zaslavsky at 17:19–24, 27:15–28.
[41] Board Decision at 15; Dep. Dr. Fedder at 20:4–22.
[42] Board Decision at 15; Dep. Dr. Fedder at 20:4–22.
[43] Board Decision at 16; Dep. Dr. Zaslavsky at 13:18–14:4; Dep. Dr. Fedder at 24:2–8.
[44] Board Decision at 16; Dep. Dr. Fedder at 24:2–20.
[45] Board Decision at 4, 10; Hearing Tr. at 47:16–19; Dep. Dr. Zaslavsky at 19:6–20:8.
[46] Dep. Dr. Zaslavsky at 61:14–62:3; Dep. Dr. Zaslavsky, Exhibit 1.

Windle continued to take pain medication, tramadol and gabapentin, and to work regular duty, but did not seek additional treatment for her work injury.[47]

17. In September 2015, Windle was diagnosed with seropositive rheumatoid arthritis ("RA"), and thereafter, began treatment for RA with Dr. Hosny, a rheumatologist.[48] In relation to Windle's RA diagnosis, Dr. Fedder noted that Dr. Hosny regularly assessed diffuse cervical, thoracic, and lumbar spine complaints.[49]

18. In August, September, and November 2015, Windle saw Dr. Hasan, but Dr. Hasan did not document any arm weakness during those visits.[50] In November 2015, Dr. Hasan documented that Windle had a normal range of motion, normal muscle strength and tone, and unremarkable gait and station.[51] Dr. Hasan described Windle's neck as "supple," and Windle denied tingling or numbness.[52]

19. Windle testified that although her pain persisted following her February 2015 work accident, her condition did not worsen until February 2016 when she began performing snow removal work again.[53] Windle further testified that, in addition to unbearable pain, she was experiencing lack of grip strength and trouble turning her head left while driving.[54]

---

[47] Board Decision at 10; Hearing Tr. at 47:20–48:13.
[48] Board Decision at 8; Dep. Dr. Zaslavsky at 67:15–19.
[49] Board Decision at 15; Dep. Dr. Fedder at 15:5–13.
[50] Board Decision at 8; Dep. Dr. Zaslavsky at 66:3–19.
[51] Board Decision at 8, 14; Dep. Dr. Zaslavsky at 66:20–67:1.
[52] Board Decision at 14; Dep. Dr. Fedder at 31:12–32:10.
[53] Board Decision at 10; Hearing Tr. at 48:25–49:4.
[54] Board Decision at 10–11; Hearing Tr. at 49:14–19.

8

20. Windle returned to see Dr. Zaslavsky on March 2, 2016.[55] Dr. Zaslavsky testified that Windle reported a decline in her activities of everyday living, including worsening changes with fine motor activities, weakness of grip, and pain down her arm.[56] Although Dr. Zaslavsky's March 2, 2016 notes indicate that Windle reported right arm pain, Dr. Zaslavsky testified this is a dictation error, and Windle's predominant complaint remained left arm pain.[57] Dr. Fedder testified that the medical records, which indicate left-sided weakness in 2015, right-sided weakness in March 2016, and left-sided weakness in April 2016, discount the possibility of a neurological finding in Windle's case because neurological weakness cannot bounce from side to side.[58]

21. Windle underwent another MRI on March 10, 2016.[59] Dr. Zaslavsky testified that the 2016 MRI showed a worsening herniation at C5–6.[60] Dr. Fedder testified that the 2016 MRI showed the pathologies at C4–5 and C6–7 improved compared to the 2015 MRI, but C5–6 worsened.[61]

22. On April 20, 2016, Windle returned to Dr. Zaslavsky, and Dr. Zaslavsky disabled her from any and all employment as of that date.[62] Dr. Zaslavsky

---

[55] Board Decision at 5; Dep. Dr. Zaslavsky at 22:3–6.
[56] Board Decision at 5; Dep. Dr. Zaslavsky at 22:16–23:20.
[57] Board Decision at 5 n.2; Dep. Dr. Zaslavsky at 22:16–23:1.
[58] Board Decision at 16; Dep. Dr. Fedder at 24:21–25:23.
[59] Board Decision at 5; Dep. Dr. Zaslavsky at 25:5–14.
[60] Board Decision at 5; Dep. Dr. Zaslavsky at 25:5–28:6.
[61] Board Decision at 15–16; Dep. Dr. Fedder at 20:23–21:6.
[62] Board Decision at 5; Dep. Dr. Zaslavsky at 29:1–30:14.

recorded a left-sided Hoffman's sign, disturbance in Windle's balance, and weakness in her left side.[63] Dr. Zaslavsky recommended addressing Windle's condition with surgical treatment, and on April 22, 2016, Windle filed a Petition for Determination of Compensation Due.

23. On June 2, 2016, Windle underwent surgery, consisting of an anterior cervical discectomy and fusion at C4–5 and C5–6.[64] Windle testified that the surgery helped alleviate her symptoms, except for her arm which still has "tingling and pain that goes down" into her fingers.[65] Dr. Fedder noted that Windle described the same type of symptoms—left-sided symptoms with diffuse weakness—before and after surgery.[66]

24. On July 12, 2016, Dr. Fedder examined Windle.[67] Dr. Fedder reviewed Windle's medical records and obtained a medical history from Windle.[68] With regard to Windle's self-reported medical history, Dr. Fedder testified that Windle told him that, prior to February 2015, she was treated for low back complaints.[69] Dr. Fedder felt that Windle's report of low back complaints was inconsistent with

---

[63] Board Decision at 5; Dep. Dr. Zaslavsky at 30:1–10.
[64] Board Decision at 5. In Dr. Zaslavsky's opinion, although the herniation at the C5–6 level caused the majority of Windle's symptoms, it was necessary to incorporate C4–5 into the fusion to prevent further surgery. Board Decision at 5–6; Dep. Dr. Zaslavsky at 31:9–32:6.
[65] Board Decision at 11; Hearing Tr. at 50:9–16.
[66] Board Decision at 14; Dep. Dr. Fedder at 9:19–10:15.
[67] Board Decision at 13; Dep. Dr. Fedder at 5:15–18.
[68] Board Decision at 13, 14–15; Dep. Dr. Fedder 5:19–6:6, 10:16–11:22.
[69] Board Decision at 14; Dep. Dr. Fedder at 10:16–11:22.

her medical records which indicate neck complaints and treatments related to the neck.[70]

25. Based on the foregoing history, Dr. Zaslavsky testified that Windle had a herniation at the C5–6 level that was compressing her spinal cord and the nerves leaving the spinal cord at the C5–6 level.[71] Dr. Zaslavsky explained that a typical presentation for a patient with this type of herniation would be both radiculopathy and myelopathy.[72] In response to Dr. Fedder's testimony, Dr. Zaslavsky explained that a sprain/strain injury does not lead to radicular problems and neurologic changes.[73] Specifically, Dr. Zaslavsky pointed to Windle's changes in grip strength, fine motor activity, and balance as inconsistent with a cervical sprain/strain.[74]

26. Dr. Zaslavsky also testified that Windle's symptoms fit the expected progression.[75] According to Dr. Zaslavsky, compression of the spinal cord, called central canal stenosis, typically gets worse in a step-wise fashion, meaning a patient may experience a period of bearable symptoms, followed by progressive loss of function.[76] For example, a patient with central canal stenosis may experience periodic numbness and pain in the arms, worsening to full-time

---

[70] Board Decision at 14; Dep. Dr. Fedder at 10:16–11:22.
[71] Board Decision at 8; Dep. Dr. Zaslavsky at 17:15–24.
[72] Board Decision at 4, 8; Dep. Dr. Zaslavsky at 21:5–20.
[73] Board Decision at 7; Dep. Dr. Zaslavsky at 39:24–39:9.
[74] Board Decision at 7; Dep. Dr. Zaslavsky at 39:19–40:6.
[75] Board Decision at 8; Dep. Dr. Zaslavsky at 16:11–19:5.
[76] Board Decision at 8; Dep. Dr. Zaslavsky at 16:11–19:5.

11

numbness and pain, worsening to loss of balance and weakness of grip.[77] On this point, Dr. Zaslavsky admitted that a traumatic event is not the only cause of central canal stenosis; it can also be caused by degenerative disc disease.[78] However, Dr. Zaslavsky opined that central canal stenosis would not progress in the course of a couple months, even in a patient with seropositive RA.[79]

27. In Dr. Zaslavsky's opinion, the cervical spine surgery was reasonable, necessary, and related to Windle's work injury.[80] While the surgery helped resolve some of Windle's symptoms, including balance and fine motor activities, Windle continues to have shooting pains in her left arm.[81] Dr. Zaslavsky testified that the C6–7 level trying to compensate for the fusion above it may be causing Windle's ongoing pain.[82]

28. Contrary to Dr. Zaslavsky's opinion, Dr. Fedder opined that Windle's MRIs reveal the natural history of a degenerative disease of the spine and do not evidence any kind of traumatic anatomic injury to the cervical spine.[83] In support of his opinion that the MRIs demonstrate a "lack of linkage" between the MRI findings and Windle's clinical exams, Dr. Fedder specifically noted that although Dr. Zaslavsky's records indicate intrinsic muscle weakness in Windle's hand,

---

[77] Dep. Dr. Zaslavsky at 18:12–19:5.
[78] Board Decision at 9; Dep. Dr. Zaslavsky at 80:2–10.
[79] Board Decision at 9; Dep. Dr. Zaslavsky at 82:17–83:8.
[80] Board Decision at 6; Dep. Dr. Zaslavsky at 34:21–35:2.
[81] Board Decision at 6; Dep. Dr. Zaslavsky at 32:7–33:4.
[82] Board Decision at 6; Dep. Dr. Zaslavsky at 32:7–33:4.
[83] Board Decision at 16; Dep. Dr. Fedder at 19:12–26:10.

12

intrinsic muscles are innervated by the C8 and T1 roots, and the MRIs did not reveal any significant pathology in the C7–T1 area.[84] Further, Dr. Fedder denied that the February 2015 work accident aggravated any pre-existing degenerative process in Windle's cervical spine.[85]

29. With regard to his opinion that Windle's injury was resolved by November 11, 2015, Dr. Fedder testified that because Dr. Hasan's November 11, 2015 records describe a normal range of motion, unremarkable gait and station, and a "supple" neck, Windle "basically ha[d] a negative neurological inventory," in his opinion.[86] Thus, November 11, 2015 presented a logical end point for a cervical sprain/strain.[87]

30. Dr. Fedder also testified that Dr. Zaslavsky's medical records, which describe left-sided weakness, followed by right-sided weakness, and then left-sided weakness, do not support a finding of a spinal or neurological basis for Windle's symptoms.[88] However, Dr. Fedder clarified that he does not doubt Windle had legitimate pain complaints given that she has RA advanced enough to treat regularly with methotrexate.[89]

---

[84] Board Decision at 16; Dep. Dr. Fedder at 21:15–22:6.
[85] Board Decision at 18; Dep. Dr. Fedder at 35:16–36:23.
[86] Board Decision at 17; Dep. Dr. Fedder at 31:12–32:10.
[87] Board Decision at 17; Dep. Dr. Fedder at 31:12–32:10.
[88] Board Decision at 16; Dep. Dr. Fedder at 25:8–23.
[89] Board Decision at 16–17; Dep. Dr. Fedder at 27:12–28:6.

31. By Decision dated September 27, 2016, the Board found that Windle had not met her burden of proof to show that her cervical spine condition, after November 2015, relates back to the February 17, 2015 work accident.[90] In reaching this decision, the Board found Dr. Fedder's opinion very convincing.[91] The Board specifically enumerated four parts of Dr. Fedder's testimony it found persuasive: (1) Dr. Fedder's testimony regarding the timeline of Windle's injury established by Dr. Hasan's records, including Dr. Hasan's November 2015 exam; (2) Dr. Fedder's opinion that Windle's current complaints of pain comport with her September 2015 seropositive RA diagnosis; (3) Dr. Fedder's opinion that the diagnostic studies reflect a natural progression of a degenerative condition as opposed to traumatic work injury; and (4) Dr. Fedder's opinion that Windle's pain complaints are not neurologically based.[92] In light of the foregoing, the Board was persuaded by Dr. Fedder's opinion that by November 11, 2015, Windle's February 2015 cervical injury was resolved, and consequently, the Board found that any treatment Windle received after November 11, 2015, including the June 2, 2016 cervical spine surgery, is causally unrelated to the compensable injury.[93]

32. Windle argues: (1) the Board's decision was not based on substantial evidence; and (2) the Board abused its discretion and erred as a matter of law by

---

[90] Board Decision at 20.
[91] *Id.*
[92] *Id.* at 20–21.
[93] *Id.* at 22.

14

allowing the State to question Windle about her personnel file and by admitting into evidence a statement related to a work incident.[94]

33. On an appeal from the Industrial Accident Board, this Court's review is limited to determining whether the decision is supported by substantial evidence and free from legal error.[95] Substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[96] This Court "does not sit as a trier of fact with authority to weigh the evidence, determine questions of credibility, and make its own factual findings and conclusions."[97] Questions of law are reviewed *de novo*, but absent an error of law, the standard of review is abuse of discretion.[98]

34. In support of her argument that the Board's decision is not supported by substantial evidence, Windle points to Dr. Fedder's lack of testimony accounting for Windle's reported weakness in grip, balance issues, and shooting pain down her left arm.[99] In contrast, Windle notes Dr. Zaslavsky's testimony that the type of radicular pain/neurological symptoms Windle reported are consistent with Dr. Zaslavsky's opinion that the work accident caused a disc herniation with spinal

---

[94] Windle Op. Br. at 11.

[95] *Glanden v. Land Prep, Inc.*, 918 A.2d 1098, 1100 (Del. 2007) (citing *Johnson v. Chrysler Corp.*, 213 A.2d 64, 66 (Del. 1965)).

[96] *Oceanport Indus., Inc. v. Wilmington Stevedores, Inc.*, 636 A.2d 892, 899 (Del. 1994) (citing *Olney v. Cooch*, 425 A.2d 610, 614 (Del. 1981)).

[97] *Glanden*, 918 A.2d at 1100 (quoting *Johnson*, 213 A.2d at 66).

[98] *Id.* (first citing *Munyan v. Daimler Chrysler Corp.*, 909 A.2d 133, 137 (Del. 2006); and then citing *Digiacomo v. Bd. of Pub. Educ.*, 507 A.2d 542, 546 (Del. 1986)).

[99] Windle Op. Br. at 14.

15

cord stenosis, but not with Dr. Fedder's opinion that the work accident caused a cervical sprain/strain.[100] Windle also takes issue with Dr. Fedder's discounting of the presence of radicular and myelopathic symptoms and his reliance on Dr. Hasan's November 2015 physical exam as evidence of the absence of such symptoms.[101]

35. "The law is well-settled that the Board, not the court, is responsible for deciding which medical expert is more believable."[102] Windle's arguments regarding the superiority of Dr. Zaslavsky's opinion to Dr. Fedder's opinion amount to a request that the Court "parse the experts' testimony in order to reach its own decision about which expert is more convincing."[103] This the Court cannot do. The Board found that Windle suffered a cervical sprain/strain that resolved by November 11, 2015. In reaching this conclusion, the Board plainly stated that it found Dr. Fedder's opinion very convincing, and the Board identified evidence to support the conclusion that Windle suffered a cervical sprain/strain, including: (1) Dr. Hasan's November 2015 physical examination of Windle; (2) Dr. Fedder's testimony that Dr. Hasan's examination indicates that Windle had a negative neurological inventory at that time; (3) Windle's seropositive RA diagnosis as a

---

[100] *Id.*

[101] *Id.* at 14–18.

[102] *Harmon v. Trans Cargo*, 2014 WL 4948408, at *2 (Del. Super. July 30, 2014) (citing *Coleman v. Dep't of Labor*, 288 A.2d 285, 287 (Del. Super. 1972)).

[103] *Id.* at *2 (citing *Clements v. Diamond State Port Corp.*, 831 A.2d 870, 878 (Del. 2003)).

16

source of Windle's complaints of pain; (4) Dr. Fedder's testimony that Windle's MRIs are consistent with the natural progression of a degenerative condition; (5) the persistence of Windle's symptoms despite surgery; and (6) Windle's preexisting cervical complaints.[104] The Court finds that the evidence enumerated by the Board is relevant evidence that a reasonable mind might accept as adequate to support the Board's conclusion. Therefore, the Court finds the Board's decision is supported by substantial evidence.

36. In support of her argument that the Board erred when it permitted the State to question Windle about May 2015, February 2016, and April 2016 disciplinary incidents, Windle maintains that the incidents were irrelevant.[105] During the hearing, Windle's counsel objected to the State's questioning on the basis of relevance; the State argued that the disciplinary actions were relevant to Windle's credibility regarding her symptomatology; and the Board permitted the questioning.[106]

37. In its decision, the Board recounted Windle's testimony and its determination that the line of questioning about the disciplinary incidents was relevant to the credibility of her complaints in its summary of the evidence,[107] but

---

[104] Board Decision at 20–22.
[105] Windle Op. Br. at 20–22.
[106] Hearing Tr. at 62:12–65:25. The Board also admitted a Memo of Reprimand into evidence. *Id.*
[107] Board Decision at 12, 12 n.3–4.

the Board did not cite the line of questioning in its findings of fact and conclusions of law. Rather, the Board expressed concern over Windle's credibility based on discrepancies between Windle's testimony regarding her medical history and her medical records. The Board specifically noted: (1) Windle's denial that she ever saw a rheumatologist prior to seeing Dr. Hosny when her medical records indicate she consulted with Dr. Tamesis in response to neck issues in 2008; and (2) her claim that Dr. Hasan treated her for right arm issues in 2010 when Dr. Hasan's records consistently indicate that the treatment was for left arm issues.[108] The precise connection between the credibility of Windle's complaints and her disciplinary record is not clear from the record; however, any error made by the Board on this issue is harmless. The core of the Board's decision concerned the opinions of competing medical experts.[109] To the extent the Board considered Windle's credibility, it plainly enumerated discrepancies between her testimony and her medical records as the basis for its concerns regarding her credibility.

---

[108] *Id* at 21 n.10.

[109] *See Wyrick v. Leaseway Auto Carriers*, 2002 WL 537591, at *4 (Del. Super. Apr. 10, 2002) ("It is clear that with or without the Board's observations of Mr. Wyrick, it would have rendered the same decision based upon the testifying medical experts. As a result, any error made by the Board with respect to Mr. Wyrick's demeanor before or after he testified is harmless.").

18

**NOW THEREFORE**, for the foregoing reasons, the September 27, 2016 Board Decision denying Jennifer Windle's Petition to Determine Compensation Due is hereby **AFFIRMED.**

**IT IS SO ORDERED.**

Jan R. Jurden, President Judge

19