# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | |
|---|---|
| CARL FOWLER, <br><br>     Claimant Below/ <br>     Appellant, <br><br> v. <br><br> PERDUE FARMS, INC., <br><br>     Employer Below/ <br>     Appellee. | )<br>)<br>)<br>)<br>)<br>)<br>)   C.A. No. K21A-01-002 NEP<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Submitted: December 21, 2021
Decided: March 16, 2022

## MEMORANDUM OPINION AND ORDER

*Upon Appellant's Appeal from the Decision of the Industrial Accident Board*

### REVERSED and REMANDED

Walt F. Schmittinger, Esquire, Schmittinger & Rodriguez, P.A., Dover, Delaware, *Attorney for Claimant Below/Appellant.*

Andrea C. Panico, Esquire, and Megan E. Traynor, Esquire, Tybout, Redfearn & Pell, Wilmington, Delaware, *Attorneys for Employer Below/Appellee.*

**Primos, J.**

Before this Court is the appeal of Carl Fowler (hereinafter "Fowler") from the decision of the Industrial Accident Board (hereinafter the "Board") finding that he did not prove, by a preponderance of the evidence, that he contracted COVID-19 at the workplace of his employer, Perdue Farms, Inc. (hereinafter "Perdue"). A final order of the Board (hereinafter the "Order") found that the Board "[does] not believe that it is more likely than not that [Fowler] contracted COVID-19 at Perdue based on the evidence presented."[1] For the reasons that follow, the Court finds that the Order is neither supported by substantial evidence nor free from legal error. Therefore, the Order is **REVERSED,** and the matter is **REMANDED** to the Board.

## I. FACTUAL AND PROCEDURAL HISTORY

Fowler contracted COVID-19 in late March of 2020. On July 14, 2020, Fowler filed a Petition to Determine Compensation Due with the Board. On November 17, 2020, the Board held a hearing on Fowler's Petition.

During the hearing, Fowler testified that he took up to two breaks during the workday and that he would spend both in the cafeteria with many other people.[2] He would be sitting shoulder to shoulder with others in the cafeteria.[3] He testified that there were "so many people" in the cafeteria during breaks that workers would "be close. Like a sardine can, close."[4] During lunch breaks, approximately 200 people would be present in the cafeteria.[5]

---

[1] Rec. Tab. 8, *Carl Fowler v. Perdue, Inc.*, IAB Hearing No. 1501167 ( Dec. 31, 2020) (hereinafter "Bd. Order") at 24.
[2] Rec. Tab 2, Tr. of Bd. Hr'g (Nov. 17, 2020) (hereinafter "Tr. of Bd. Hr'g") at 61–62, 78. The lunch period was 30 minutes. *Id.* at 61. Fowler had an additional break, during the times he worked late, which he would similarly spend in the cafeteria with other people. *Id.* at 61–62.
[3] *Id.* at 79.
[4] *Id.*
[5] *Id.* at 61.

Fowler presented symptoms for COVID-19 on March 27[6] and tested positive for COVID-19 at the emergency room on March 29, 2020. The emergency room record states, "Patient high risk for possible underlying COVID-19 infection. Given that he is still working at Perdue factory over the last two weeks."[7] Barrington Brown, M.D. (hereinafter "Dr. Brown"), Fowler's primary care physician, testified[8] that the emergency room was aware of an "outbreak at the Perdue factory" during that time.[9]

Ronald Dukes, Safety and Security Manager at Perdue, confirmed that chairs and tables in the cafeteria were not moved further apart until March 24. He also confirmed that a worker at the facility had presented symptoms as early as March 18 and had later tested positive for COVID-19.[10] He affirmed that between March 18 and March 27, Perdue had identified 28 employees who potentially had COVID-19 and were taken out of work.[11] On March 30, Perdue shut down operations to perform a deep cleaning of the facility given the large number of cases.[12]

Perdue's retained expert, Alfred E. Bacon, III, M.D. (hereinafter "Dr. Bacon"), testified that there are three modes of transmission of COVID-19. The high-risk mode is droplet spread, which is the "number one risk factor." Airborne spread is "very low risk," and "surface areas" are "minimal risk."[13] During his

---

[6] Initially, the date Fowler's symptoms began was incorrectly asserted as March 22 in the Petition. Mrs. Fowler clarified, during the Board proceedings, that she "got it wrong" and it was in fact March 27. *Id.* at 86. This corrected date, March 27, was confirmed through Fowler's medical records. Rec. Tab. 4, Dep. Tr. of Alfred E. Bacon, III, M.D.) (hereinafter "Dep. Tr. of Dr. Bacon") at 10, 31.

[7] Tr. of Bd. Hr'g at 33; Rec. Tab. 3, Dep. Tr. of Dr. Brow (hereinafter "Dep. Tr. of Dr. Brown") at 77.

[8] Both Dr. Brown and Perdue's retained expert, Dr. Bacon, testified by deposition prior to the November 17 hearing.

[9] Dep. Tr. of Dr. Brown at 78–79.

[10] Tr. of Bd. Hr'g at 112–13, 114–15.

[11] *Id.* at 113.

[12] *Id.*

[13] Dep. Tr. of Dr. Bacon at 21.

3

testimony, Dr. Bacon confirmed the statement in his report that "there is no doubt that in [Fowler's workplace] environment he acquired COVID-19,"[14] and that he was reasonably certain that Fowler did not acquire COVID-19 from his home environment "based on [his] lack of any contact outside the house, except for going to the grocery, which certainly does have risks but lower risks than the cafeteria."[15] Dr. Bacon also stated that Perdue, as a workplace with a high-density population, would be a much higher-risk setting than, for example, a grocery store.[16] Dr. Bacon stated that "the average time to develop [COVID-19] is about 5 and a half days postexposure" with "48 hours" being the earliest.[17] A "close contact," in other words the duration of time it typically takes to contract COVID-19 while near a COVID-positive individual, is considered to be fifteen minutes.[18]

Dr. Brown's testimony was confined primarily to the extent of Fowler's injuries. As to the causation of Fowler's COVID-19, Dr. Brown agreed with Dr. Bacon that the most likely source was Fowler's workplace.[19] However, he could not make an independent determination as to causation to a reasonable degree of medical certainty without a further understanding of Fowler's other contacts, as he had never asked him questions pertaining to those.[20]

On December 31, 2020, the Board issued its Order denying Fowler's Petition. The Board found that Fowler had not proved that he had contracted COVID-19 from his workplace, and that it need not determine whether COVID-19 is an occupational

---

[14] *Id.* at 22; Bd. Order at 5–6.
[15] Dep. Tr. of Dr. Bacon at 22.
[16] *Id.* at 36.
[17] *Id.* at 37.
[18] *Id.* at 19 ("It is all a question of timing and how close [one is] to other individuals and lack of mitigating technique.").
[19] Dep. Tr. of Dr. Brown at 32.
[20] *Id.* at 40.

4

disease within the meaning of the Delaware Workers' Compensation Act (hereinafter the "Act"). Fowler filed a notice of appeal on January 13, 2021.[21]

Following briefing, the Court held oral argument on December 21, 2021. The Court has reviewed the full record (hereinafter the "Record") and all submissions of the parties. Accordingly, this case is ripe for decision.

## II. PARTIES' CONTENTIONS

Fowler argues that he was subject to a "high-density [work] environment, including regular and consistent meals in the cafeteria" that presented a particularly increased risk, or "enhanced hazard," of COVID-19 exposure.[22] In support of this position, Fowler points to Dr. Bacon's opinion in his expert report, as confirmed in his testimony, that "there is no doubt" that he acquired COVID-19 from his workplace.[23] He argues that the Board's conclusions about "other possibilities" of COVID-19 exposure are not supported by substantial evidence. In addition, Fowler contends that the Board committed legal error in applying an incorrect burden by stating that "no one can say for sure where [Fowler] contracted [COVID-19]."[24]

In arguing these points, Fowler contends that even though Dr. Bacon and Dr. Brown may not have been aware of all of Fowler's potential "social contacts," the Court can make an inference, given their testimony about the "high risk" of Perdue's workplace versus other contacts, that their expert testimony would not change if confronted with such information.[25] Additionally, some of the other contacts, such as Fowler's getting a birthday present from Walmart for his daughter on March 1, are inconsequential because they fall outside the relevant range of time to develop

---

[21] D.I. 1.
[22] Fowler's Opening Br. at 26 n.2 (D.I. 11).
[23] *Id.* at 23.
[24] *Id.* at 27–28.
[25] Fowler's Reply Br. at 9 (D.I. 15).

symptoms following exposure.[26]   For these reasons, Fowler requests that this Court reverse the Order and find both that Fowler has established that he contracted COVID-19 in the workplace and that COVID-19 is an occupational disease.

Perdue conceded at oral argument that some of the statements in the Board's Order, as mentioned *supra*, amounted to speculation. However, Perdue argues that the Board made credibility determinations and found both Dr. Brown's and Dr. Bacon's testimony to be non-credible because they were not presented with all the salient contacts: *e.g.,* Fowler did not report to Dr. Bacon whether he had 1) been present at Dr. Brown's office on March 16 without wearing a mask or social distancing while other patients were present; 2) picked up his medications at a pharmacy; or 3) worn a mask while pumping gas or washed his hands afterwards.[27] Thus, Defendant argues that Fowler possibly had additional contacts beyond those of which Dr. Bacon was aware, and that such contacts and exposure could have altered Dr. Bacon's opinion.[28]   Accordingly, Perdue contends that the Board "correctly found . . . that [Fowler] failed to provide any evidence to establish that it is more likely than not that [he] was exposed to the virus at Perdue, as opposed to a possible exposure at any of his other contacts outside of work."[29]   Perdue requested at oral argument that if this Court is inclined to reverse, it remand the decision for further inquiry regarding whether or not the additional contacts would alter the medical experts' testimony regarding causation.

### III. STANDARD OF REVIEW

On appeal from an administrative board's final order, this Court must determine whether the board's findings are supported by substantial evidence and

---

[26] *Id.* at 8.

[27] Perdue's Answering Br. at 25, 26 (D.I. 12).

[28] *Id.* at 26.

[29] *Id.*

6

are "free from legal error."[30] The Court does not weigh the evidence or make its own factual findings—rather, it determines if the evidence was adequate to support the administrative board's factual findings.[31] Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[32] Under the substantial evidence standard, the Court must "search the entire record to determine whether, on the basis of all of the testimony and exhibits before the [board], it could fairly and reasonably reach the conclusion that it did."[33] In addition, the Court must view the record in the light most favorable to the prevailing party.[34] However, the Court's deference to the board's decision is not "altogether without teeth,"[35] and the Court need not "defer to findings that are not rationally supported by substantial evidence in the record."[36]

With respect to questions of law, the Court's review is *de novo* to determine "whether the Board erred in formulating or applying legal precepts."[37] Hence, if the administrative board's decision is free from legal error and supported by substantial evidence, it must be affirmed.[38]

---

[30] *Optima Cleaning Sys. v. Unemployment Ins. Appeal Bd.*, 2010 WL 5307981, at *2 (Del. Super. Dec. 7, 2010).

[31] *Id.* (citing *Johnson v. Chrysler Corp.*, 213 A.2d 64, 66 (Del. 1965)).

[32] *Breeding v. Contractors-One-Inc.*, 549 A.2d 1102, 1104 (Del. 1988).

[33] *Nat'l Cash Register v. Riner*, 424 A.2d 669, 674-75 (Del. Super. 1980) (citing *Winship v. Brewer School Comm.*, 390 A.2d 1089, 1092-93 (Me. 1978)).

[34] *Wyatt v. Rescare Home Care*, 81 A.3d 1253, 1259 (Del. 2013).

[35] *Murphy & Landon, P.A. v. Pernic*, 121 A.3d 1215, 1217 (Del. 2015).

[36] *Id.* at 1222.

[37] *Bermudez v. PTFE Compounds, Inc.*, 2006 WL 2382793, at *3 (Del. Super. Aug. 16, 2006), *aff'd*, 929 A.2d 783 (Del. 2007) (citing *Anchor Motor Freight v. Ciabattoni*, 716 A.2d 154, 156 (Del. 1998); *Hudson v. State Farm Mut. Ins. Co.*, 569 A.2d 1168, 1170 (Del. 1990)).

[38] *Motiva Enter. v. Sec'y of Dept. of Nat. Res. & Envtl. Control*, 745 A.2d 234, 242 (Del. Super. 1999).

## IV. DISCUSSION

**A. The Board committed legal error, and failed to base its decision upon substantial evidence, by acting as its own expert and speculating regarding facts not in the record.**

At the outset, the Court does not take issue with the Board's prerogative to assess Dr. Bacon's and Dr. Brown's opinions by determining whether they are based upon accurate and complete information regarding Fowler's contacts. To this point, Dr. Bacon did give his opinion with the caveat that it was based "on the lack of any contact outside the house, except for going to the grocery, which certainly does have risks but lower risks than the cafeteria."[39] In addition, Dr. Brown did not have knowledge of Fowler's contacts beyond that stated by Dr. Bacon: instead, accepting Dr. Bacon's statements as true, Dr. Brown agreed that Fowler contracted COVID-19 from his workplace.[40] The Board found that Dr. Bacon was not aware of additional contacts, which in turn implicated Dr. Brown's finding, as it was based on Dr. Bacon's report—although the Board did not question the medical experts' credentials as infectious disease experts.

However, the Board may not substitute its own purported knowledge for that of the experts *in the fields of their expertise*. In this case, the Board improperly relied upon knowledge apparently gained from extrajudicial sources (and notably without any attribution to such sources) to draw its own conclusions regarding causation of Fowler's COVID-19. The Board speculated as follows regarding the causation of Fowler's illness—a conclusion subject to the expertise of an infectious disease expert, not a lay board:

---

[39] Dep. Tr. of Dr. Bacon at 22.
[40] Dep. Tr. of Dr. Brown at 32.

8

(1) "[M]ore than 12 million Americans have contracted COVID-19 since March 2020 from various sources. This virus is prevalent throughout the United States and the world, **so the Board believes that [Fowler] could have contracted the virus in many ways and many places.**"[41]

(2) "There was no testimony indicating that [Fowler] wore gloves at the gas pumps or washed his hands immediately after touching the gas pump, so **it is just as possible** that [Fowler] contracted COVID-19 from an exposure at Royal Farms as at Perdue."[42]

(3) "There are **a tremendous number of places where a person can contract COVID-19** and essential businesses have remained open since the beginning of this worldwide pandemic. At a bare minimum, [Fowler] went to Royal Farms, Walmart, Dr. Brown's office, a laboratory, and work during in [sic] the weeks leading up to his diagnosis and **he could have caught COVID-19 in any of those places.**"[43]

(4) "Although these are **all unknown factors and possibilities, those possibilities are just as likely** places and circumstances that could have exposed [Fowler] to the virus; the point is **no one can say for sure** where [Fowler] contracted it . . . ."[44]

While this Court is called upon to take "due account" of the Board's "experience and specialized competence" with regard to factual determinations,[45]

---

[41] Bd. Order at 24 (emphasis supplied).

[42] *Id.* at 21 (emphasis supplied).

[43] *Id.* at 24 (emphasis supplied).

[44] *Id.* (emphasis supplied).

[45] *Histed v. E.I. Du Pont de Nemours & Co.*, 621 A.2d 340, 342 (Del. 1993).

9

the above pronouncements by the Board concern matters beyond that expertise. The Board is simply not qualified to determine how likely it is for an individual to contract COVID-19 in certain environments—and it is certainly not qualified to conclude that it is "just as likely" that Fowler contracted the disease at other places that he visited in the weeks prior to onset as at his workplace.

Similarly, the Court does not question the Board's right to assess the credibility of witnesses, notably Fowler himself.[46] However, the Board may not, in questioning the veracity of some of Fowler's testimony, substitute additional facts not supported by evidence in the record for facts provided by Fowler, or otherwise speculate as to facts not found in the record. The Board did both in its Order:

(1) "[T]he Board believes [Fowler] went to Walmart or other stores **more often than [Fowler] suggests** and it is possible he was exposed to COVID-19 at Walmart."[47]

(2) "**[Fowler] and his family had numerous contacts outside of Perdue** in the weeks leading to his diagnosis and, therefore, **the Board finds that [Fowler] has not met his burden.**"[48]

(3) "Furthermore, [Fowler's] daughter was attending school and afterschool activities, as well as riding the school bus, on a daily basis until the State of Emergency was imposed on March 13[th], so **she could have contracted COVID-19** and been asymptomatic, but still passed it on to [Fowler]."[49]

---

[46] *See Patterson v. Brandywine Counseling Inc*, 2010 WL 4513539, at *2 n.39 (Del. Super. Nov. 3, 2010) (refusing to "second-guess" a Board's determination of the credibility of witnesses); *see also Johnson v. Chrysler Corp.*, 213 A.2d 64, 67 (Del. 1965) (reversing the trial court for determining the question of credibility of witnesses).

[47] Bd. Order at 20 (emphasis supplied).

[48] *Id.* at 24 (emphasis supplied).

[49] *Id.* (emphasis supplied).

10

Thus, while the Board may have questioned Fowler's credibility, it could not speculate that, in addition to the March 1 Walmart visit to which his wife admitted (which, incidentally, was far beyond the average incubation period to which Dr. Bacon testified), Fowler visited Walmart and other unspecified retail establishments on other occasions prior to the onset date of March 27 *when there is no evidence in the record of such visits*. Similarly, the Board could not manufacture "numerous" unspecified contacts, not supported by any testimonial or other evidence, simply because it disbelieved Fowler's testimony regarding the contacts to which he admitted. Finally, it was improper for the Board to speculate that Fowler's daughter experienced an asymptomatic course of the disease when there is *absolutely no evidence* in the record that she ever contracted COVID-19.

In this case, all expert testimony on causation points in one direction. Both experts agreed that Fowler contracted COVID-19 from his workplace with levels of certainty ranging from "no doubt"[50] to a concurring agreement.[51]

The Delaware Supreme Court has previously held that the Board cannot ignore "unrebutted medical evidence" and substitute its own judgment for that of a medical expert.[52] Here, the Court finds that in some instances the Board made statements, which could be considered either findings or conclusions, that ignored the unrebutted medical testimony, and substituted it with findings that were not rationally supported by substantial evidence in the record.[53] For example, Dr. Bacon said on multiple occasions that Perdue's work environment, specifically the cafeteria

---

[50] Dep. Tr. of Dr. Bacon at 22; Bd. Order at 5–6.

[51] Dep. Tr. of Dr. Brown at 32.

[52] *Pusey v. Natkin & Co.*, 428 A.2d 1155, 1157 (Del. 1981); *cf. Clements v. Diamond State Port Corp.*, 831 A.2d 870, 878 (Del. 2003) ("It is well established that the Board cannot substitute its judgment to nullify the objective findings of a medical expert that fully support the claimant's subjective complaints.").

[53] *See Murphy & Landon*, 121 A.3d at 1222 ("Even though our standard of review of [administrative board] decisions is deferential, it is not meaningless, and we need not defer to findings that are not rationally supported by substantial evidence in the record.").

11

setting, was a high-density area that is more likely to lead to exposure.[54] In the face of this unrebutted expert testimony, the Board referred to "other possibilities" such as getting gas or purchasing a gift at Walmart, which the Board deemed "just as likely" as sources for Fowler's COVID-19.[55]

However, many of these "other" contacts—both actual and hypothetical—are, based upon Dr. Bacon's unrebutted testimony, less likely to have been the cause of the exposure. No expert testimony was presented that the act of getting gas outside or going to a grocery store was equivalent to sitting in a cafeteria, shoulder to shoulder, and eating with co-workers for a duration long enough to contract the virus. In fact, Dr. Bacon was asked this precise question, and he responded that a "grocery store" was considered "low risk" and "any work environment with a high density of people" was "high risk."[56] In addition, Dr. Bacon testified that eating increases the droplets and contagion in the room and that to contract the disease an individual needs at least fifteen minutes of contact with another person.[57]

In short, the Board failed to consider 1) the lower probability these additional contacts have of spreading COVID-19 given the expert testimony, 2) the lack of evidence in the record that COVID-19 positive people were around Fowler in these other locations or events, and 3) the decreased likelihood of some events' being the source of exposure given the time frame one must consider for contracting the disease following exposure (*e.g.*, Fowler's visit to Walmart on March 1, 26 days prior to his development of symptoms). Therefore, the Order must be reversed for at least two reasons: (1) the Board rejected unrebutted expert testimony in the record,

---

[54] Fowler's Opening Br. at 15 ("Dr. Bacon characterized the cafeteria as a 'high risk environment' because (1) people are in close contact; (2) people are speaking, chewing, eating, spewing droplets throughout the air environment, and no one is wearing masks." (citing Tr. of Bd. Hr'g at 42–43; Dep. Tr. of Dr. Bacon at 19)).

[55] Bd. Order at 24.

[56] Dep. Tr. of Dr. Bacon at 22, 36–37.

[57] *Id.* at 19.

and instead relied upon its own purported expertise and extrajudicial knowledge regarding the spread of COVID-19, to reach conclusions about causation in this case, and (2) the Board relied upon its determination that Fowler had additional contacts with the outside world, and additional potential exposure to the virus from a family member (*i.e.*, his daughter), despite a complete absence of any support in the record for those purported facts.

This does not end the inquiry, however, concerning the proper disposition of this appeal. The Court is troubled that Dr. Bacon—upon whose causation opinion Dr. Brown explicitly relied—was seemingly unaware of certain facts regarding Fowler's contacts with the outside world that may have affected his causation opinion, primarily because Dr. Bacon relied almost exclusively upon Fowler's wife's account of Fowler's non-workplace contacts leading up to the onset of his illness,[58] and because he had no opportunity to hear Mr. and Mrs. Fowler's testimony at the hearing (*i.e.*, since Dr. Bacon testified by deposition prior to the hearing). Specifically, (1) Dr. Bacon was apparently unaware that Fowler had visited Dr. Brown's office on March 16, 2020, eleven days before the onset of his symptoms;[59] and (2) while Dr. Bacon assumed that Fowler and his wife began "isolating" shortly after the declaration of the State of Emergency on March 12, 2020,[60] Mrs. Fowler testified at the hearing that she and her husband did not begin "self-isolating" until after Fowler visited the emergency room on March 29 and was told to self-isolate.[61]

Therefore, this Court, rather than simply reversing, will reverse and remand so that Dr. Bacon can be further questioned regarding whether these (and perhaps

---

[58] *Id.* at 8.

[59] Dr. Brown testified—also by deposition prior to the hearing, and separately from Dr. Bacon's deposition—that fifteen patients were in his office that day, and that social distancing procedures were not in place. Dep. Tr. of Dr. Brown at 45.

[60] Dep. Tr. of Dr. Bacon at 8.

[61] Tr. of Bd. Hr'g at 86–87.

13

other[62]) contacts of which he was previously unaware would alter his opinion that, to a reasonable degree of medical probability, Fowler contracted COVID-19 at the workplace.

**B. The Board erred by imposing an incorrect burden of proof upon Fowler.**

The Order is also reversible for an entirely separate reason: the Board committed legal error by imposing an incorrect burden of proof on Fowler as the claimant. The appropriate burden is whether or not it is **more likely than not** that Fowler contracted COVID-19 from his workplace. "Proof by a preponderance of the evidence means proof that something is more likely than not. It means that certain evidence, when compared to the evidence opposed to it, has the more convincing force and makes you believe that something is more likely true than not."[63] As is apparent from the Board's comments regarding causation noted *supra*, the Board considered evidence of other contacts that the medical experts reported to be lower risk—some not even substantiated by the record—to have the same "convincing force" as exposure from the Perdue workplace, which the unrebutted medical expert testimony deemed a high-risk environment for the transmission of COVID-19.

Moreover, the Board committed legal error by applying what appears to be an impossible, and incorrect, burden upon Fowler in his effort to prove that he had contracted COVID-19 from the workplace. According to the Board, "There are **a tremendous number of places where a person can contract COVID-19. . .** [t]he

---

[62] *E.g.*, it appears that Dr. Bacon may not have been aware that Fowler went to Royal Farms to obtain gas for his vehicle in the weeks prior to onset, but given Dr. Bacon's observation that an (indoor) grocery store visit is a low-risk contact, it appears unlikely that he would opine that (outdoor) gas station visits would alter his opinion as to causation.

[63] *ReCor Med., Inc. v. Reinhard Warnking & Sound Interventions, Inc.*, 2013 WL 3760022, at *9 (Del. Ch. May 31, 2013) (internal quotations and citation omitted); Delaware's Civil Pattern Jury Instructions at 37 (defining the preponderance of the evidence standard with the same language).

point is **no one can say for sure** where [Fowler] contracted [COVID-19]."[64] The point here, however, is that Fowler was not required to say "for sure" where he contracted COVID-19—essentially a "beyond a reasonable doubt" standard. Rather, he is required only to produce evidence establishing by a *preponderance—i.e.,* more likely than not—that he contracted COVID-19 at Perdue. He has done so through the testimony of Dr. Bacon—assuming, of course, that the additional contact information referenced *supra* does not alter Dr. Bacon's previously provided opinions.

The Board also used the virulent nature of the disease to impose an improperly high burden on Fowler. As noted *supra*, because (at least according to the Board) there are a number of places where Fowler *could* have contracted COVID-19, Fowler is unable to establish by a preponderance of the evidence that he contracted it at Perdue. However, Dr. Bacon, utilizing his expertise, was able to classify risks as "high," "low," and "minimal," and applying those risk levels, he was able to determine, to a reasonable degree of medical probability, that Fowler contracted the disease at Perdue.

To be sure, immediately prior to announcing its determination at the close of the Order, the Board stated that it "does not believe that it is more likely than not that [Fowler] contracted COVID-19 at Perdue based on the evidence presented."[65] However, this brief acknowledgement of the preponderance standard is belied by the Board's analysis of the facts—both actual and speculative—in reaching its decision.

---

[64] Bd. Order at 24 (emphasis supplied).
[65] *Id.*

Fowler was not required to negate all possible non-workplace exposures to COVID-19 to meet his burden.[66] Rather, he was required to show that it was more likely than not that he contracted COVID-19 from his workplace as compared to his outside activities that are supported by the record.

**C. The Court will not reach the issue of whether COVID-19 qualifies as an occupational disease.**

Fowler has asked the Court to determine that COVID-19 qualifies as an occupational disease pursuant to the Act. The Board, however, never reached that issue because it determined that Fowler had not shown that he contracted the disease at his workplace. Therefore, the issue is not before the Court, and the Court declines to decide it at this time.[67]

## V. CONCLUSION

For the reasons explained *supra*, this matter is **REVERSED** and **REMANDED** for further proceedings consistent with this opinion as follows:

1. Dr. Bacon should testify as to whether additional relevant contacts of which he may not have been aware would alter his opinion that Fowler contracted COVID-19 at his workplace.

2. The Board should consider only social contacts that are supported by substantial evidence when determining whether Fowler has met his burden and should not speculate as to other possibilities, and further the

---

[66] *See Hoult v. Workers' Comp. Com'r*, 383 S.E.2d 516, 519 (W. Va. 1989) ("In proving . . . causal connection, '[a] claimant in an occupational disease case is not required to negative all possible non-occupational causes of the disease.'" (citation omitted)); 100A C.J.S. Workers' Compensation § 1055 ("The claimant is not required to negate all possible nonoccupational causes of the disease." (citation omitted)).

[67] *See Ingino-Cacchioli v. Infinity Consulting Solutions, Inc.*, 2021 WL 3702442, at *2 (Del. Super. Aug. 19, 2021) (observing that the Board is the "appropriate decision-making body" to make a determination of whether COVID-19 is defined as an occupational disease "in the first instance").

Board should weigh relevant contacts in the record in light of the unrebutted expert testimony.

3. If the Board finds that Fowler has met his burden to show that he contracted COVID-19 at Perdue, the Board should go on to determine whether or not COVID-19 is an occupational disease pursuant to the Act.

Jurisdiction is not retained.

**IT IS SO ORDERED.**

_____
Judge

NEP/tls
*Via File & ServeXpress*
oc:   Prothonotary
        Counsel of Record

17